**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD A. DAVIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| ELIZABETH F. DAVIS, individually and | ) | |
| as Trustee of the  Wilfred E. Davis Trust | ) | |
| dated February 7, 1985 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

```
FILED: MAY 5, 2008
08 CV 2542   JH
JUDGE LEINENWEBER
MAGISTRATE JUDGE VALDEZ
```

## COMPLAINT

Richard A. Davis, by his attorneys Jerry A. Esrig and Robert J. Zaideman, complains of the defendant Elizabeth F. Davis, individually, and as Trustee of the Wilfred E. Davis Trust dated February 7, 1985, as follows:

## COUNT I

1.      Plaintiff Richard A. Davis ("Richard") is a citizen of the State of Florida.

2.      Defendant Elizabeth Davis ("Elizabeth") is the successor to Wilfred E. Davis as Trustee of the Wilfred E. Davis Trust dated February 7, 1985 (the "Trust").

3.      Plaintiff is a citizen of the State of Florida and defendant is a citizen of the State of Illinois.  The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 USC §1332.

4.      In 2005, the City of Chicago filed suit against Nailite International, Inc., a Delaware corporation ("Nailite Delaware") asserting various claims arising out of alleged environmental contamination of a property known as the Amforge Site.

5.      Subsequently, Nailite Delaware filed a third-party complaint against Richard, among others, seeking indemnification for the claims of the City of Chicago.  (A copy of Nailite

-1-

Delaware's third-party complaint is attached hereto as Exhibit A.  The underlying complaint filed by the City of Chicago is an exhibit to the third-party complaint.)

6.      Nailite Delaware-'s claim for indemnification was based upon allegations that pursuant to a Stock Purchase Agreement dated as of April 15, 1988 (the "SPA") Nailite Delaware (then known as Nailite Acquisition Co.) purchased all of the shares of stock of Nailite International, Inc., an Illinois corporation ("Nailite Illinois") from all of the shareholders of Nailite Illinois.  (A copy of the SPA upon which Nailite Delaware relied in its third-party complaint is attached to the third-party complaint.)  Nailite Delaware alleged that the SPA contained provisions by which the selling shareholders, including Richard, agreed to indemnify, defend and hold harmless Nailite Illinois against all claims relating to certain distributed assets, including the Amforge Site.

7.      In 1992 Nailite Illinois merged into Nailite Delaware.  It is as the successor to Nailite Illinois that Nailite Delaware asserted its third party complaint for indemnification.

8.      At the time the SPA was executed, the Trust owned 72.28% of the shares of stock of Nailite Illinois, and Richard owned 11.37%.  Wilfred E. Davis signed the SPA as Trustee of the Trust.  To the extent that Richard owed any duty of indemnification to Nailite Illinois under the SPA, the Trust was jointly and severally liable as a co-indemnitor.

9.      As more fully hereinafter set forth, it was the acts and omissions of Wilfred E. Davis as Trustee which gave rise to the City's claims against Nailite Illinois and the subsequent claim for indemnification by Nailite Delaware against Richard.

10.      Prior to 1983, the Trustee was the sole shareholder of W.E. Davis Co., an Illinois corporation ("WED").  In 1983 the Trustee caused WED to acquire the Amforge Site.

11.      The Trustee was also the controlling shareholder of Nailite International, Inc., a Texas corporation ("Nailite Texas").  Richard was a minority shareholder of Nailite Texas.

12.     In 1986 the Trustee caused Nailite Texas to merge into WED, which thereupon changed its name to Nailite International, Inc., the corporation which is referred to herein as Nailite Illinois.  Any duty to clean up environmental contamination at the Amforge Site on the part of Nailite Illinois arose as a result of the Trustee's orchestration of the transactions described in paragraphs 9 and 11

13.     As a result of the merger of Nailite Texas into WED and the change of name of WED to Nailite International, Inc., Richard became a shareholder of Nailite Illinois.

14.     The Trustee directed Richard to sign the SPA, and it was as a shareholder of Nailite Illinois that Richard signed the SPA.

15.     The Trustee did not tell Richard, and Richard did not know, that Nailite Illinois owned the Amforge Site, that Nailite Illinois could be liable for the costs of cleaning up the contamination of the Amforge Site, and that by signing the SPA Richard might become personally liable for those costs.

16.     Richard signed the SPA for the benefit of the Trust which instigated the sale of stock pursuant to the SPA and which received significant benefits as a result of the sale.

17.     Nailite Delaware did not sue the Trust nor assert indemnification claims against it.

18.     In or about, January, 2008, the indemnification claims of Nailite Delaware against Richard and the other parties to the SPA who had been sued by Nailite Delaware were settled. The total amount paid by the selling shareholders sued under the SPA was $75,000, of which amount Richard paid $20,000.  In addition, Richard incurred attorneys fees of approximately $135,000 defending himself and other indemnitors sued under the SPA.

19.     Richard is entitled to be indemnified by the Trust for all amounts paid by him to settle and defend the suit brought by Nailite Delaware.  In the alternative, the Trust is liable to

Richard for the Trust's proportionate share of the settlement amount and legal fees paid by Richard.

**WHEREFORE**, plaintiff Richard A. Davis prays that this Court enter judgment in his favor and against Elizabeth F. Davis, as Trustee of the Wilfred E. Davis Trust dated February 7, 1985 in the amount of $155,000.00, for costs of suit and for such other and further relief as the Court deems just.

## COUNT II

1 - 19.  Plaintiff realleges and incorporates paragraphs 1 through 19 of Count I as paragraphs 1 - 19 of this Count II

20.    On information and belief, the Elizabeth F. Davis, as Trustee, has made or caused to be made unauthorized distributions of the Trust's assets to herself and others in excess of $155,000.00, such that there are now insufficient assets in the Trust to satisfy the claims of Richard for indemnification or contribution.

**WHEREFORE**, plaintiff Richard A. Davis prays that this Court enter judgment in his favor and against Elizabeth F. Davis, individually, in the amount of $155,000.00, for costs of suit and for such other and further relief as the Court deems just.

Respectfully submitted,

/s/Jerry A. Esrig_____
Zaideman & Esrig, P.C.
10 S. Riverside Plaza, Suite 1020
Chicago, IL 60606
312/207-0005

Attorney for Richard A. Davis

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 2, 2008, the foregoing was filed electronically with the Clerk of the U.S. District Court for the Northern District of Illinois, to be served by operation of the Court's electronic filing system.


                                     /s/Jerry A. Esrig                    

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, | | |
| | Plaintiff, | |
| v. | | Case No.  05 C 05148 |
| ARVINMERITOR, INC., NAILITE INTERNATIONAL, INC., GRAHAM PARTNERS, INC., and COMMONWEALTH EDISON COMPANY, | | Judge:  David H. Coar<br>     08 CV 2542<br>     JUDGE LEINENWEBER<br>     MAGISTRATE JUDGE VALDEZ |
| | Defendants. | |
| NAILITE INTERNATIONAL, INC., | | |
| | Third-Party Plaintiff, | |
| v. | | |
| THE ESTATE OF WILFRED E. DAVIS, ELIZABETH F. DAVIS, RICHARD A. DAVIS, DARYL A. BOYD, DIANE JOSEPH FELDMAN, and DALLAS M. CRICK, | | |
| | Third-Party Defendants. | |

## NAILITE INTERNATIONAL, INC.'S THIRD-PARTY COMPLAINT

Pursuant to Fed. R. Civ. P. 14(a), Defendant/Third-Party Plaintiff Nailite International, Inc. ("Nailite"), by its undersigned attorneys, hereby asserts this Third-Party Complaint against Third-Party Defendants The Estate of Wilfred E. Davis, Elizabeth F. Davis, Richard A. Davis, Daryl A. Boyd, Diane Joseph Feldman, and Dallas M. Crick (collectively, "Third-Party Defendants"), and in support thereof avers as follows:

## PARTIES AND JURISDICTION

1.      Nailite International, Inc. is a Delaware corporation with its principal place of business located in Miami, Florida.

2.      Upon information and belief, The Estate of Wilfred E. Davis is being or will be probated in the State of Illinois.

3.      Upon information and belief, Elizabeth F. Davis is a resident of Buffalo Creek, Illinois.

4.      Upon information and belief, Richard A. Davis is a resident of Miami Beach, Florida.

5.      Upon information and belief, Daryl A. Boyd is a resident of Inverness, Illinois.

6.      Upon information and belief, Diane Joseph Feldman is a resident of Barrington, Illinois.

7.      Upon information and belief, Dallas M. Crick is a resident of New Port Richey, Florida.

8.      Jurisdiction is proper pursuant to 28 U.S.C. § 1367(a) because Nailite's claims in this Third-Party Complaint against the Third-Party Defendants are related to the claims asserted in the Complaint that Plaintiff, City of Chicago, has brought against Nailite. The declaratory relief requested in this Third-Party Complaint is authorized pursuant to 28 U.S.C. § 2201. Further necessary and proper relief is authorized by 28 U.S.C. § 2202.

9.      Venue is proper in this District because Nailite's claims against the Third-Party Defendants are related to the claims in the Complaint that Plaintiff, City of Chicago, has brought against Nailite. The actions giving rise to the claims alleged herein occurred in this District.

## GENERAL ALLEGATIONS

10.    Plaintiff City of Chicago has filed a Complaint against, inter alia, Nailite in this action asserting various claims arising out of alleged environmental contamination of a property known as the Amforge Site.  A true and correct copy of the City's Complaint is attached here as Exhibit A.

11.    The Third-Party Defendants were stockholders of Nailite from at least December 30, 1986 to April 15, 1988.

12.    The Third-Party Defendants, as Sellers, entered into a Stock Purchase Agreement dated as of April 15, 1988 (the "1988 SPA"), under which they agreed to sell their shares and interest in Nailite.  A true and correct copy of the 1988 SPA is attached here as Exhibit B.

13.    The Third-Party Defendants agreed in the 1988 SPA to indemnify, defend, and hold harmless Nailite against all claims relating to, inter alia, certain Distributed Assets, which included Nailite's interest in the Amforge property which is the underlying subject of this litigation.

14.    In an Assumption of Liabilities agreement entered into in connection with the 1988 SPA, each of the Third-Party Defendants further agreed to "pay, perform and discharge any and all obligations and liabilities of Nailite International, Inc., an Illinois corporation, . . . arising out of transactions entered into prior to the Closing Date."  A true and correct copy of the Assumption of Liabilities agreement is attached here as Exhibit C.

15.    Under the 1988 SPA and the Assumption of Liabilities agreement, the Third-Party Defendants are or may be liable to Nailite for all or part of the City's claim against Nailite.

## COUNT I

### (Declaratory Judgment 28 U.S.C. § 2201)

16.    Nailite incorporates by reference Paragraphs 1 through 15 inclusive.

17.    Pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, the Court may declare the rights and other legal relations of any interested party seeking such declaration.

18.    The Third-Party Defendants are liable to Nailite for all or part of the City's claim against Nailite.

19.    A declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist among the parties.

## COUNT II

### (Declaratory Judgment 735 ILCS 5/2-701)

20.    Nailite incorporates by reference Paragraphs 1 through 19 inclusive.

21.    Pursuant to the Illinois Uniform Declaratory Judgment Act, 735 ILCS 5/2-701, the Court may, with respect to any contract or other written instrument, declare the rights of the parties in cases of actual controversy.

22.    The Third-Party Defendants are liable to Nailite for all or part of the City's claim against Nailite.

23.    A declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist among the parties.

WHEREFORE, Nailite respectfully requests that this Court:

A.    Declare that the Third-Party Defendants are obligated to indemnify, defend, and hold harmless Nailite against all claims relating to Nailite's interest in the Amforge property which is the underlying subject of this litigation;

B.    Declare that the Third-Party Defendants are obligated to pay, perform and discharge any and all obligations and liabilities of Nailite arising out of the Amforge property which is the underlying subject of this litigation; and

C.    Grant such further relief as the Court deems just and appropriate.

Dated: June 21 2006               Respectfully submitted,

/s/ B. Todd Vinson
B. Todd Vinson - ARDC No. 6276105
Drinker Biddle & Reath LLP
161 North Clark Street
48th Floor
Chicago, Illinois 60601
Telephone: (312) 977-1510
Facsimile: (312) 977-1511

*One of the Attorneys for Nailite International, Inc.*

## PROOF OF SERVICE

B. Todd Vinson, an attorney, certifies that on the 21st day of June, 2006, he caused a copy of Nailite International, Inc.'s Third-Party Complaint to be electronically mailed to:

> Kevin B. Hynes, Esquire
> Mark R. Davis, Esquire
> O'Keefe, Lyons & Hynes, LLC
> 30 North LaSalle Street
> Suite 4100
> Chicago, Illinois 60602
> Phone: (312) 621-0400
> Fax: (312) 621-0297
> **Attorneys for Plaintiff City of Chicago**
>
> Jerome I. Maynard, Esquire
> James W. McConkey, Esquire
> Dykema Gossett PLLC
> 10 South Wacker Drive
> Suite 2300
> Chicago, Illinois 60606
> Phone: (312) 876-1700
> Fax: (312) 876-1155
> **Attorneys for Defendant ArvinMeritor, Inc.**

/s/ B. Todd Vinson

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 7 of 103
Case 1:05-cv-05148    Document 1     Filed 09/08/2005    Page 1 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 1 of 58

FILED

SEP - 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CITY OF CHICAGO, a Municipal
Corporation,

    Plaintiff,

  v.

ARVINMERITOR, INC., a Nevada corporation,
NAILITE INTERNATIONAL, INC., a Delaware
corporation, and GRAHAM PARTNERS, INC.,
a Pennsylvania corporation,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**05C 5148**

Case No.:

**JUDGE COAR**

JURY TRIAL DEMANDED

**MAGISTRATE JUDGE NOLAN**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the City of Chicago ("the City"), by its attorneys, O'Keefe, Lyons & Hynes,
LLC, and Mara S. Georges, Corporation Counsel for the City of Chicago, for its Complaint
against the above named Defendants, states as follows:

### NATURE OF THE CASE

1. In this lawsuit, the City seeks injunctive relief, fines, and damages in connection with
Defendants' release, disposal, and storage of hazardous substances and other waste at a site
bounded by 118th and 119th Streets and Loomis and Racine Streets in the City of Chicago (the
"Site"). The Site is commonly referred to as the Amforge Site.

2. Portions of the Site were owned and/or operated by the Defendants and/or their
predecessors from the early 1900s until the late 1980s.

3. The Site is located in an area surrounded by homes, schools, and other public and
private facilities.

### JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to Sections 107(a) and
113(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980

EXHIBIT A

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 8 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 2 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 2 of 58

("CERCLA"), as amended, 42 U.S.C. §§ 9607(a) and 9613(b), Section 7002(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), and under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over all other claims in this Complaint under 28 U.S.C. § 1367(a).

5.  Venue is proper in this judicial district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1391(b), because the releases of hazardous substances giving rise to the claims alleged herein occurred in this district.

## THE PARTIES

6.  The City is a municipal corporation and a home rule unit under the laws of the State of Illinois and under Article VII of the Illinois Constitution.  The City has standing to bring this lawsuit under both statutory and common law.

7.  Rockwell Automation ("Rockwell") is a Delaware corporation licensed to do business in Illinois.  Rockwell is not a party to this litigation.

8.  Defendant ArvinMeritor, Inc. ("Arvin") is a Nevada corporation licensed to do business in Illinois.

9.  Defendant Nailite International, Inc. is a Delaware corporation with its principal place of business located in Miami, Florida.

10. The Defendant Graham Partners, Inc. is a Pennsylvania corporation with its principal place of business located in Newton, Pennsylvania.

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 9 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 3 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 3 of 58

## GENERAL ALLEGATIONS

### Site Operations

11. Beginning in the early 1900s, the Rockwell and Arvin, or their predecessors, began operating a manufacturing facility at the Site. Operations at the Site included, among other things, a die shop, a heat treating area, a pickling area, a forge shop, a laboratory, a cooling tank, and several underground storage tanks.

12. Manufacturing operations continued at the Site until the 1980s under various names including, Amforge Division of American Brake Shoe, Amforge Division of Rockwell, and W.E. Davis Co.

13. Amforge, Inc., a division of Rockwell, operated the Site until approximately 1983.

14. Arvin is the successor in interest to Amforge, Inc.

15. In approximately 1983, Amforge, division of Rockwell, sold the property to W.E. Davis Co., an Illinois corporation.

16. In 1986, W.E. Davis Co. merged with Nailite International, Inc., a Texas corporation. W.E. Davis Co. was the surviving corporation and became known as Nailite International, Inc., an Illinois corporation.

17. Nailite International, Inc., an Illinois corporation, owned the Site until approximately April 1988.

18. The Defendant Nailite International, Inc. is the successor in interest to W.E. Davis Co. and Nailite International, Inc., an Illinois corporation.

19. The Defendant Nailite International, Inc. is a wholly-owned subsidiary of the Defendant Graham Partners, Inc.

20. In December 1998, the City took title to the Site pursuant to a tax deed.

3

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 10 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 4 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 4 of 58

### Nature of the Contamination at the Site

21. Between 1996 and 2000, the City retained environmental consulting firms to investigate the Site to determine the nature and extent of contamination that might be present at the Site.

22. As a result of those investigations, several contaminants were determined to be present in the soil at the Site including, but not limited to: (a) polychlorinated biphenyls ("PCBs"); (b) lead; (c) arsenic; (d) chromium; (e) benzo(a)anthracene; (f) benzo(b)flouranthene; (g) benzo(a)pyrene; (h) carbazole; (i) debenzo(a,h)anthracene; (j) indeno(1,2,3-cd)pyrene; and (k) naphthalene.

23. In addition to the contaminants, the environmental consulting firms identified the following at the Site: (a) several dilapidated buildings; (b) stained soil; (c) various types of debris; and (d) sumps and pits filled with petroleum-smelling liquids.

### City's Work at the Site

24. In June 1999, the City entered the Site in the Illinois Environmental Protection Agency's ("Illinois IEPA") Site Remediation Program ("SRP"). The SRP is a voluntary remediation program implemented by the Illinois EPA.

25. For purposes of the SRP, the Site has been separated into the East and West Parcels. The City's complaint seeks costs incurred and to be incurred at both parcels.

26. From May through December 2001, the City and its contractors performed, among other things, the following activities at both parcels: (a) removed 4,505 tons of petroleum-contaminated soil; (b) removed all surficial concrete pads, walls, foundations, and footers; (c) pumped and steam cleaned all tunnels and vaults encountered at the Site; and (d) removed 139,900 gallons of contaminated water from tunnels, excavations, and the pump house.

Case 1:08-cv-02542 Document 1-2 Filed 05/05/2008 Page 11 of 103
Case 1:05-cv-05148 Document 1-2 Filed 09/08/2005 Page 3 of 58
Case 1:05-cv-05148 Document 70 Filed 06/21/2006 Page 3 of 58

27. From October 6, 2003 through December 1, 2003, the City and its contractors performed the following activities on the East Parcel pursuant to Illinois EPA-approved Remedial Action Plans: (a) hazardous substance-contaminated soil removal; (b) confirmation sampling; and (c) crushed concrete sampling and analysis.

28. In September 2002, the City submitted to the Illinois EPA a Remedial Action Plan for the West Parcel. The Illinois EPA approved the RAP. The City and its contractors are currently implementing the RAP at the West Parcel.

29. In October 2002, the City submitted to the Illinois EPA a RAP for the remediation of PCB contamination at the West Parcel. Remediation work continues at the Site.

### COUNT I
### (CERCLA)

30. The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint as though fully set forth herein.

31. The Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

32. The Defendants are "persons" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

33. Each of the Defendants or their predecessor is a liable person within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as an owner and/or operator of the Site.

34. The identified contaminants at the Site, including (a) polychlorinated biphenyls ("PCBs"); (b) lead; (c) arsenic; (d) chromium; (e) benzo(a)anthracene; (f) benzo(b)flouranthene; (g) benzo(a)pyrene; (h) carbazole; (i) debenzo(a,h)anthracene; (j) indeno(1,2,3-cd)pyrene; and (k) naphthalene are "hazardous substances" as defined in Section 101 (14) of CERCLA, 42 U.S.C. § 9601(14).

35. There have been "releases" or threats of releases of the above-described "hazardous

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 12 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 6 of 58
Case 1:05-cv-05148    Document 70    Filed 08/21/2006    Page 6 of 58

substances" into the environment at the Site, as those terms are defined in Sections 101(14) and 101(22) of CERCLA, 42 U.S.C. §§ 9601(14) & (22).

36. The City has incurred necessary costs of response as a result of actual and threatened releases of hazardous substances at the Site. The City's response costs incurred to date are consistent with the National Contingency Plan.

37. Defendants are jointly and severally liable for all response costs incurred by the City at the Site to date, and pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. §9607(a)(4)(B), are liable for all future response costs that are necessary for the protection of human health and the environment and consistent with the National Contingency Plan.

38. The City is a "person" who is entitled to bring this action within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

39. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. §9607(a), the City is entitled to interest on response costs it has incurred.

40. There is a present and actual controversy between the City and Defendants concerning their respective rights and obligations with respect to the costs of response associated with the Site.

41. The City seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), holding Defendants liable for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

WHEREFORE, the City respectfully requests that this Court:

A.    Enter judgment in favor of the City and against the Defendants for all response costs that the City has incurred and will incur in connection with the Site, plus interest;

Case 1:08-cv-02542     Document 1-2     Filed 05/05/2008     Page 13 of 103
Case 1:05-cv-05148     Document 1     Filed 09/08/2005     Page 7 of 58
Case 1:05-cv-05148     Document 70     Filed 06/21/2006     Page 7 of 58

B.    Declare that the Defendants are liable for further response costs and/or damages; and

C.    Grant such further relief as the Court deems just and appropriate.

## COUNT II
### (Cost Recovery Under Section 22.2
of the Illinois Environmental Protection Act)

42. The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint as though fully set forth herein.

43. The Site is a "facility" as defined in Section 22.2(h) of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/22.2(h).

44. The identified contaminants at the Site, including PCBs, lead, arsenic, chromium benzo(a)anthracene, and benzo(b)fluoranthene, benzo(a)pyrene, dibenzo(a,h)anthracene, indeno(1,2,3-cd) pyrene, are "hazardous substances" as defined in Section 3.215 of the Act, 415 ILCS 5/3.215.

45. Section 22.2(f) of the Act, 415 ILCS 5/22.2(f), provides, in part, that the following persons shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide:

(1)        *        *        *

(2)    any person who at the time of disposal, transport, storage or treatment of a hazardous substance or pesticide owned or operated the facility . . . used for such disposal, transport, storage or treatment from which there was a release or substantial threat of a release of any hazardous substance or pesticide;

46. There is and has been a release or substantial threat of a release of hazardous

7

substances as defined in Section 3.215 of the Act, 415 ILCS 5/3.215, into the environment at and from the Site within the meaning of Section 22.2(f) of the Act, 415 ILCS 5/22.2(f).

47. The Defendants are each a  "person" within the meaning of Section 3.315 of the Act, 415 ILCS 5/3.315.

48. The Defendants are liable persons within the meaning of Section 22.2(f) of the Act, 415 ILCS 5/22.2(f), as persons "who at the time of disposal, transport, storage or treatment of a hazardous substance or pesticide owned or operated the facility . . . used for such disposal, transport, storage or treatment from which there was a release or substantial threat of a release of any hazardous substance or pesticide" within the meaning of Section 22.2(f).

49. The City has and will continue to incur removal and other response costs as defined in Section 22.2(f) of the Act, 415 ILCS 5/22.2(f).

50. Defendants are liable to the City for the City's costs of removal and remedial action pursuant to Section 22.2(f) of the Act, 415 ILCS 5/22.2(f).

WHEREFORE, the City respectfully requests that this Court:

A.    Enter judgment in favor of the City and against Defendants for all response costs that the City has incurred and will incur in connection with the Site;

B.    Declare that Defendants shall be liable for further response costs and/or damages; and

C.    Grant such further relief as the Court deems just and appropriate.

## COUNT III
### (Common-Law Public Nuisance)

51. The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint as though fully set forth herein.

52. This count is brought to enjoin Defendants from further creating, allowing, or

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 15 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 9 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 9 of 58

maintaining a common-law public nuisance at, on, or under the Site and to obtain the complete, immediate, and permanent abatement of the common-law public nuisance existing at, on, or under the Site.

53. The conditions existing at, on, or under the Site, as alleged, have injuriously affected the safety, health, welfare, or morals of the public, or worked substantial annoyance, inconvenience, or injury to the public and constitute a public nuisance within the meaning of the common law.

54. The public nuisance existing at, on, or under the Site, as alleged, was caused by and is the result of Defendants', or their predecessors' failure, through action or inaction, to adequately, reasonably, or properly use, keep, clean, manage, maintain, or secure the Site.

55. The current conditions on the Site are a foreseeable consequence of Defendants', or their predecessors' failure to adequately, reasonably, or properly use, keep, clean, manage, maintain, or secure the Site.

56. The City has the power and authority to prevent and abate nuisances. 65 ILCS 5/11-60-2.

57. The Defendants or their predecessors have created or allowed, and are currently continuing to maintain at, on, or under the Site a public nuisance within the meaning of the common law for which injunctive and other relief is available.

WHEREFORE, the City respectfully requests that this Court:

A.    Enter a judgment finding that Defendants or their predecessors created or allowed, and are currently allowing or maintaining a common-law public nuisance at, on, or under the Site and are jointly and severally liable therefor;

B.    Enter a permanent injunction ordering Defendants to: (1) permanently cease allowing or maintaining a public nuisance at, on, or under the Site; (2) completely,

immediately, and permanently abate the nuisance by removing and disposing of all hazardous, noxious, or unhealthy substances or materials, garbage, waste, and debris from the Site, in accordance with all applicable laws and regulations by a date certain established by the Court; (3) sample the Site for subsurface contamination and completely, immediately, and permanently abate the nuisance posed by subsurface contamination by removing and disposing of all contaminated subsurface material in accordance with all applicable laws and regulations by a date certain established by the Court; and (4) permanently enclose and secure the Site with appropriate security fences until such time as the Site is redeveloped or otherwise restored, occupied, and put to a lawful use;

C.     As an alternative to paragraph B above, authorize the City to perform the abatement actions set forth in paragraph B and order Defendants to pay the City for the costs associated with the abatement;

D.     Retain jurisdiction of this matter until such time as all abatement activities have been appropriately completed; and

E.     Grant such further relief as the Court deems just and appropriate.

### COUNT IV
### (Unpermitted Disposal of Waste: Section 11-4-1500 of the City of Chicago Municipal Code)

58. The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint as though fully set forth herein.

59. Section 11-4-1500 of the City of Chicago Municipal Code ("Municipal Code") provides in part:

> No person shall (1) cause or allow the open dumping of any waste,
> ... (3) dispose, treat, abandon or transport any waste, except at a
> site or facility which meets the requirements of the Illinois

10

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 17 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 11 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 11 of 58

Environmental Protection Agency and which is permitted pursuant
to this chapter.

60. The Defendants are each a "person" as defined in Section 11-4-120 of the Municipal

Code.

61. The Site is not a site or facility that meets the requirements of the Illinois

Environmental Protection Agency for storage or disposal of solid waste or hazardous waste, nor is

the Site permitted by the City pursuant to the requirements of Section 11-4-1500 of the Municipal

Code.

62. The material, items, and substances found at the Site by the City's inspectors and

contractors are "waste" as that term is defined in the Section 11-4-120 of Municipal Code.

63. The Defendants or their predecessors have caused or allowed the open dumping of

waste on the Site.

64. The Defendants or their predecessors have disposed or abandoned waste on the Site.

65. The Defendants or their predecessors have violated Section 11-4-1500 of the Code by

causing or allowing the open dumping of waste on the Site and disposing or abandoning waste on

the Site.

66. Section 11-4-1590(a) of the Code provides:

> Any person who violates Section 11-4-1500. . .of this article may
> be punished by a fine of $1,000.00 for the first offense and
> $2,000.00 for the second and each subsequent offense. Each day
> that a violation continues shall constitute a separate and distinct offense.

WHEREFORE, the City respectfully requests that this Court:

A.    Find that Defendants or their predecessors are in violation of Section 11-4-1500 of

       the Code;

B.    Enter a permanent injunction ordering Defendants to: (1) permanently cease

       causing or allowing the open dumping of any waste at the Site; (2) permanently

11

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 18 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 12 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 12 of 58

cease disposing and/or abandoning any waste at the Site; (3) sample the soil and groundwater at the Site for subsurface contamination and completely, immediately, and permanently abate the nuisance posed by subsurface contamination by removing and disposing of all contaminated subsurface material in accordance with all applicable laws and regulations by a date certain established by the Court; and (4) permanently enclose and secure the Site with appropriate security fences until such time as the Site is redeveloped or otherwise restored, occupied, and put to a lawful use;

C.    As an alternative to paragraph B above, authorize the City to perform the abatement actions set forth in paragraph B and order Defendants to pay the City for the costs associated with the abatement;

D.    Retain jurisdiction of this matter until such time as all abatement activities have been appropriately completed;

E.    Assess penalties against Defendants in the maximum amounts per day provided for under Section 11-4-1590 of the Municipal Code; and

F.    Grant such further relief as the Court deems just and appropriate.

## COUNT V
### (Public Nuisance - Failure to Remove Debris:
### Sections 7-28-060 and 7-28-450 of the City of Chicago Municipal Code)

67.    The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint as though fully set forth herein.

68.    Section 7-28-060 of the Chicago Municipal Codes provides that:

No building, vehicle, structure, receptacle, yard, lot, premises, or part thereof, shall be made, used, kept, maintained, or operated in the city if such use, keeping, maintaining, or operating shall be the occasion of any nuisance, or shall be dangerous to life or detrimental to health.
Every building or structure constructed or maintained in violation of the building

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 19 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 13 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 13 of 58

provisions of this Code,...or in an unsafe or dangerous condition, or which in any manner endangers the health or safety of any person or persons, is hereby declared to be a public nuisance.

Any person found guilty of violating any of the provisions of this section shall be subject to a penalty of not less than $200.00 nor more than $500.00, or imprisonment not to exceed 10 days, or both such fine and imprisonment for each offense. Each day such violation shall continue shall constitute a separate and distinct offense.

69.     Section 7-28-450 of the Municipal Code provides, in part:

> The owner, occupant, agent or person in possession or control of any lot or unimproved parcel of real estate ("owner") shall remove or cause to be removed therefrom any abandoned or derelict motor vehicle . . . , garbage, debris, refuse, litter and miscellaneous waste. Unremoved material of such nature is hereby declared to be a public nuisance. Any owner or other person found in violation of this section shall be fined not less than $200.00 and not more than $1,000.00 for each offense, and each day on which such an offense shall continue shall constitute a separate and distinct offense

70.     The Defendants or their predecessors are each a former "owner, occupant, agent or person in possession or control" of the Site as defined in Section 7-28-450 of the Municipal Code.

71.     During the time they owned or operated the Site, the Defendants or their predecessors did not remove the garbage, debris, refuse, litter, and miscellaneous waste discovered by the City on the Site.

72.     The garbage, debris, refuse, litter, and miscellaneous waste found at the Site were not permitted to accumulate on the parcels pursuant to a properly issued license or permit.

73.     The hazardous substances and other contamination found at the Site are detrimental to human health.

74.     Defendants or their predecessors have violated and continue to violate Sections 7-28-60 and 7-28-450 of the Municipal Code by failing to remove the garbage, debris, refuse, litter, and miscellaneous waste on the Site.

13

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 20 of 103
Case 1:05-cv-05148   Document 1    Filed 09/08/2005   Page 14 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 14 of 58

WHEREFORE, the City respectfully requests that this Court:

A.    Find that Defendants or their predecessors are in violation of Sections 7-28-060
      and 7-28-450 of the Municipal Code;

B.    Enter a permanent injunction ordering Defendants to remove the garbage, debris,
      refuse, litter, and miscellaneous waste on the Site;

C.    As an alternative to paragraph B above, authorize the City to conduct the actions
      set forth in paragraph B and order Defendants to pay the City for the costs
      associated with the actions;

D.    Retain jurisdiction of this matter until such time as removal of the garbage, debris,
      refuse, litter, and miscellaneous waste on the Site has been appropriately
      completed;

E.    Assess penalties against Defendants in the maximum amounts per day provided for
      under Sections 7-28-060 and 7-28-450 of the Municipal Code; and

F.    Grant such further relief as the Court deems just and appropriate.

## COUNT VI
### (RCRA)

75.   The City realleges, and incorporates by reference, paragraphs 1 through 29 of this
Complaint as though fully set forth herein.

76.   Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), provides, in relevant part, that:

      [A]ny person may commence a civil action on his own behalf-

      (1)   (B) against any person, including the United States and any other
            governmental instrumentality or agency, to the extent permitted by the
            eleventh amendment of the Constitution, and including any past or present
            generator, past or present transporter, or past or present owner or operator
            of a treatment, storage, or disposal facility, who has contributed or who is
            contributing to the past or present handling, storage, treatment,
            transportation, or disposal of any solid or hazardous waste which may
            present an imminent and substantial endangerment to health or the

14

environment...

77.     The Defendants or their predecessors are each a "person" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15), who at the time of the disposal of the solid and hazardous wastes owned and/or operated the Site, within the meaning of Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

78. The City of Chicago is a "person" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

79.     The identified contaminants found at the Site, constitute "solid" and/or "hazardous waste" as defined in Section 1004(5) & (27) of RCRA, 42 U.S.C. § 6903(5) & (27).

80.     As a result of Defendants' or their predecessors ownership and operation of the Site, Defendants are owners and/or operators of a treatment, storage or disposal facility, as defined in Section 1004(5) & (27) of RCRA, 42 U.S.C. § 6903(5) & (27), on or about the Site.

81.     Defendants or their predecessors in interest have contributed to the generation, handling, storage, treatment, transportation or disposal of solid and/or hazardous wastes which may present an imminent and substantial endangerment to human health and the environment.

82.     On January 11, 2005, Plaintiff served Defendants with a Notice of Intent to File Suit under RCRA, pursuant to 42 U.S.C. § 6972(b), by mailing said notice via registered mail return receipt requested to O'Keefe, Lyons & Hynes, LLC. On January 11, 2005, Plaintiff also mailed copies of the notices to Rene Cipriano, Director of the IEPA, Michael Leavitt, Administrator of U.S. EPA, and Bharat Mathur, Regional Administrator of the U.S. EPA, in accordance with 42 U.S.C. § 6972 (b) and 40 C.F.R. § 254. Copies of said Notices and corresponding return receipts are attached hereto as Exhibit A.

83.     Plaintiff is not aware of any action taken on behalf of the United States, any

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 22 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 16 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 16 of 58

Federal Agency or the State of Illinois to commence and diligently prosecute an action to abate the conditions that present the endangerment.

WHEREFORE, Plaintiff, City of Chicago, respectfully requests that this Court:

A.    Grant City of Chicago injunctive relief ordering Defendants to remove all solid and hazardous wastes from the Site, remediate the Site to a remedial objective which is fully protective of human health and the environment, and take such further action as may be necessary to abate the imminent and substantial endangerment.

B.    Grant City of Chicago the costs of litigation (including but not limited to reasonable attorney's and expert witness fees) as authorized by 42 U.S.C. § 6972(e) of the United States Code.

C.    Grant City of Chicago such further relief as the Court deems just and appropriate.

**COUNT VII**
**(Cost Recovery of Amounts Spent by City:**
**Section 1-20-020 of the City of Chicago Municipal Code)**

84.    The City realleges, and incorporates by reference, paragraphs 1 through 29 of this Complaint and Counts I through VI as though fully set forth herein.

85.    Section 1-20-020 of the City of Chicago Municipal Code ("Municipal Code" or "Code") provides:

> Any person who causes the city or its agents to incur costs in order to provide necessary services as the result of such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability.

86.    The Defendants or their predecessors are each a "person" within the meaning of Section 1-20-020 of the Municipal Code.

16

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 23 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 17 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 17 of 58

87.    Section 21 of the Act, 415 ILCS 5/21, provides, in part, that no person shall:

(a)    Cause    or    allow    the    open    dumping    of    any    waste.

(d)    Conduct any waste-storage, waste-treatment, or waste-disposal operation:

(1) without a permit granted by the Agency . . . .

(e) Dispose, treat, store or abandon any waste, or transport any waste into this State for disposal, treatment, storage or abandonment, except at a site or facility which meets the requirements of this Act and of regulations and standards thereunder.

88.    Section 3.305 of the Act, 415 ILCS 5/3.305, defines "open dumping" as the consolidation of refuse from one or more sources at a disposal site that does not fulfill the requirements of a sanitary landfill.

89.    Section 3.535 of the Act, 415 ILCS 5/3.535, defines "waste," in part, as any garbage, . . . , or other discarded material, including solid, liquid, semi-solid, . . . resulting from industrial, commercial, mining and agricultural operations . . . ."

90.    The Defendants or their predecessors have violated federal, state, and local laws by causing or allowing releases of hazardous substances into the environment at the Site and caused other waste and debris to be disposed of, abandoned, or otherwise exposed and released to the environment at the Site.

91.    Pursuant to federal, state and local laws the Defendants have a legal duty to cleanup and remediate the Site and have failed to do so.

92.    The City has undertaken investigation, assessment, and remediation at the Site. In conducting such activities, the City has incurred costs in order to provide necessary services as a result of Defendants' violations of federal, state and local laws.

93.    The costs incurred by the City are "costs" as that term is defined in Section 1-20-

17

020 of the Municipal Code.

94.     Section 1-20-060 of the Code provides that:

>       In any action brought to collect a debt under this chapter, the City
>       of Chicago shall also be entitled to recover a penalty in an amount
>       equal to the city's court costs and attorney's fees.

WHEREFORE, the City respectfully requests that this Court:

A.      Find that Defendants or their predecessors are in violation of Section 1-20-020 of

        the Code;

B.      Enter a permanent injunction against Defendants requiring them to cease violating

        Section 1-20-020 of the Code;

C.      Order Defendants to pay the City for the costs the City has incurred and will incur

        to provide necessary services as a result of Defendants' violations of federal, state,

        and local laws;

D.      Assess penalties against Defendants in the maximum amounts provided for under

        Section 1-20-060 of the Municipal Code;

E.      Tax all costs in this action, including but not limited to attorney's and expert

        witness fees and any other costs, against Defendants; and

F.      Grant such further relief as the Court deems just and appropriate.

18

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 25 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 19 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 19 of 58

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff City of Chicago demands trial by jury on any issue triable of right by a jury.

Respectfully submitted

By: _____

Kevin B. Hynes
Mark R. Davis
Jason T. Shilson
O'KEEFE, LYONS & HYNES, LLC
30 N. LaSalle Street, Suite 4100
Chicago, Illinois 60602
(312) 621-0400

ATTORNEYS FOR THE
CITY OF CHICAGO

Diane M. Pezanoski  (6190003)
Deputy Corporation Counsel
Rosemary Krimbel  (6204892)
Senior Counsel
CITY OF CHICAGO
30 N. LaSalle, Room 900
Chicago, Illinois 60602
(312) 744-4263

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 26 of 103
Case 1:05-cv-05148   Document 1-2   Filed 09/08/2005   Page 20 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 20 of 58

# EXHIBIT
# A1

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 27 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 27 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 27 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

February 1, 2005

VIA CERTIFIED U.S. MAIL

Corporation Service Company
Registered Agent for Nailite International, Inc.
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Re:    Notice of Intent to Pursue Legal Action
       (Amforge Site, Chicago, Illinois)

To Registered Agent:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 28 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 22 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 22 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2

Registered Agent for
Nailite International, Inc.

February 1, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 29 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 23 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 23 of 58

Page 3

Registered Agent for
Naillite International, Inc.

February 1, 2005

bcc: Rosemary Krimbel

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 30 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 24 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 24 of 58

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Corporation Service
Company
Registered Agent for
Nailite International, Inc
2711 Centerville Rd.
Ste. 400
Wilmington DE 19808

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Laura M. Cooper*    ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

WILMINGTON DE
FEB 07 2005
USPS · 19808

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered    ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7001 2510 0005 4914 7772

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7001 2510 0005 4914 7772

Postage  $ .60
Certified Fee  2.30
Return Receipt Fee (Endorsement Required)  1.75
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees  $ 4.65

Sent To
Corp. Service Co. Registered Agent for Nailite
Street Apt. No.; or PO Box No.  2711 Centerville Rd. Ste 400
City, State, ZIP+4  Wilmington DE 19808

PS Form 3800, January 2001    See Reverse for Instructions

Case 1:08-cv-02542   Document 1-2    Filed 05/05/2008    Page 31 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 25 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 25 of 58

# EXHIBIT
# A2

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 32 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 26 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 26 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

January 11, 2005

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7833

James E. Hendricks Jr.
Registered Agent for Nailite International, Inc.
2001 Spring Road, Suite 265
Oak Brook, IL 60521

Re:   Notice of Intent to Pursue Legal Action
        (Amforge Site, Chicago, Illinois)

To Mr. Hendricks:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 33 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 27 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 27 of 58

## O'Keefe Lyons & Hynes, LLC

Page 2

Registered Agent for
Nailite International, Inc.

January 11, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:    Michael O. Leavitt, Administrator, USEPA
       Bharat Mathur, Regional Administrator, USEPA
       Renee Cipriano, Director, IEPA

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 34 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 28 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 28 of 58

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

James E. Hendricks Jr.
Registered Agent for Nailite International, Inc.
2001 Spring Road, Suite 265
Oak Brook, IL 60521

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                                    ☐ Agent
                                     ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

Amburn
2. Article Number    7003 3110 0002 8440 7833    2001 Spring Rd

PS Form 3811, August 2001          Domestic Return Receipt          102595-01-M-25



Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 35 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 29 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 29 of 58

# EXHIBIT
# A3

Case 1:08-cv-02542 Document 1-2 Filed 05/05/2008 Page 36 of 103
Case 1:05-cv-05148 Document 1 Filed 09/08/2005 Page 30 of 54
Case 1:05-cv-05148 Document 70 Filed 06/21/2006 Page 30 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

January 11, 2005

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7826

General Counsel
Nailite International, Inc.
1111 NW 165th Street
Miami, FL 33169-5819

Re:     Notice of Intent to Pursue Legal Action
        (Amforge Site, Chicago, Illinois)

To Whom It May Concern:

        This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource
Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that
the City intends to pursue legal action against you seeking an order requiring you to remediate
what is known as the Amforge Site. This complaint will also seek an order requiring you to
reimburse the City for costs it has and continues to incur remediating the Site.

        The evidence we have gathered to date indicates that your company or its predecessor was
an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th
Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in
size and is the former location of the Amforge manufacturing facility.

        Over the last few years, the City of Chicago has acquired the Site and other abandoned
industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site,
the City's environmental consultants determined that the property is heavily contaminated with
hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is
understood under the Comprehensive Environmental Response, Compensation and Liability Act
("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City
has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois'
voluntary remediation program. The City is working toward obtaining a No Further Remediation
letter based on industrial/commercial clean-up objectives. The Site, however, remains
contaminated and poses an imminent and substantial endangerment to the surrounding
community.

        The complaint we have prepared seeks the recovery of approximately $1.5 million in past
costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also
seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims
under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various
municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 37 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 31 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 31 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2

Nailite International,
Inc.

January 11, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:    Michael O. Leavitt, Administrator, USEPA
       Bharat Mathur, Regional Administrator, USEPA
       Renee Cipriano, Director, IEPA

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 38 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 32 of 58
Case 1:05-cv-05148   Document 70   Filed 08/21/2006   Page 32 of 58

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

General Counsel
Nailite International, Inc.
1111 NW 165th Street
Miami, FL 33169-5819

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                            ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)

   7003 3110 0002 8440 7826        Anderson
                                   1111 NW 165th St

PS Form 3811, August 2001        Domestic Return Receipt        102595-01-M-2509

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

7003 3110 0002 8440 7826

Postage      $        .60
Certified Fee          2.30
Return Reciept Fee     1.75
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees  $  4.65

Sent To  General Counsel
Street, Apt. No.;  Nailite International, Inc.
or PO Box No.  1111 NW 165th Street
City, State, ZIP+4  Miami, FL 33169-5819

PS Form

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 39 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 33 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 33 of 58

# EXHIBIT
# A4

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 40 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 34 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 34 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

January 11, 2005

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7864

CT Corporation System
Registered Agent for Rockwell Automation, Inc.
8025 Excelsior Drive, Suite 200
Madison, WI  53717

Re:     Notice of Intent to Pursue Legal Action
        (Amforge Site, Chicago, Illinois)

To Whom It May Concern:

        This firm represents the City of Chicago.  Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site.  This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

        The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site.  The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago.  The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

        Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area.  After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  Sampling results revealed the presence of, among other things, PCBs.  The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP").  The SRP is Illinois' voluntary remediation program.  The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives.   The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

        The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs.  The City, however, has yet to complete the remediation.  Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site.  The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances.  While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 41 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 35 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 35 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2

Registered Agent for<br>Rockwell Automation

January 11, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:   Michael O. Leavitt, Administrator, USEPA
      Bharat Mathur, Regional Administrator, USEPA
      Renee Cipriano, Director, IEPA

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 42 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 36 of 58
Case 1:05-cv-05148   Document 70   Filed 08/21/2006   Page 36 of 58

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Kim Cleland_  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery<br>Kim Cleland  1-13-05<br>D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| 1. Article Addressed to:<br><br>CT Corporation System<br>Registered Agent for Rockwell Automation, Inc<br>8025 Excelsior Drive, Suite 200<br>Madison, WI 53717 | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article     7003 3110 0002 8440 7864      Kimberly<br> 8025 Excelsior Dr | |
| PS Form 3811, August 2001     Domestic Return Receipt      102595-01-M-2509 | |

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com™

| | |
|---|---|
| Postage | $  60 |
| Certified Fee | 2.30 |
| Return Reciept Fee<br>(Endorsement Required) | 1.75 |
| Restricted Delivery Fee<br>(Endorsement Required) | |
| Total Postage & Fees | $  4.65 |

7003 3110 0002 8440 7864

Sent To   CT Corporation System
Street,   Registered Agent for Rockwell Automation, Inc
or PO B   8025 Excelsior Drive, Suite 200
City, St   Madison, WI 53717

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 43 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 37 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 37 of 58

# EXHIBIT
# A5

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 44 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 38 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 38 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

January 11, 2005

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7857

General Counsel
Rockwell Automation, Inc.
777 East Wisconsin Avenue, Suite 1400
Milwaukee, WI   53202

Re:    Notice of Intent to Pursue Legal Action
         (Amforge Site, Chicago, Illinois)

To Whom It May Concern:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 45 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 39 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 39 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2                                                          Rockwell Automation

January 11, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:    Michael O. Leavitt, Administrator, USEPA
       Bharat Mathur, Regional Administrator, USEPA
       Renee Cipriano, Director, IEPA

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 46 of 103
Case 1:05-cv-05148   Document L   Filed 09/08/2006   Page 40 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 40 of 58



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

General Counsel
Rockwell Automation, Inc.
777 West Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *B. Snopek*     ☐ Agent   ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
P. SNOPEK                        1/14/04

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number      7003 3110 0002 8440 7857    *Ambrose*
                                                  *777 E. Wisconsin Ave*

PS Form 3811, August 2001      Domestic Return Receipt      102595-01-M-2509

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

| | |
|---|---|
| Postage | $ .60 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

7003 3110 0002 8440 7857

Sent To  General Counsel
Street   Rockwell Automation, Inc.
or PO    777 West Wisconsin Avenue, Suite 1400
City,    Milwaukee, WI 53202

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 47 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 41 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 41 of 58

# EXHIBIT
# A6

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 48 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 42 of 58
Case 1:05-cv-05148    Document 70    Filed 08/21/2006    Page 42 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

January 11, 2005

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7871

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

Mr. Vernon Baker
Senior Vice President, General Counsel
ArvinMeritor, Inc.
2135 West Maple Road
Troy, MI 48084

Re:    Notice of Intent to Pursue Legal Action
       (Amforge Site, Chicago, Illinois)

To Mr. Baker:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 49 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 43 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 43 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2              ArvinMeritor

January 11, 2005

municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident that a judge will rule in the City's favor.

    The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:    Michael O. Leavitt, Administrator, USEPA
       Bharat Mathur, Regional Administrator, USEPA
       Renee Cipriano, Director, IEPA

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 50 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 44 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 44 of 58

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

| | |
|---|---|
| Postage | $ .60 |
| Certified Fee | 2.40 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.65 |

Sent To  Mr. Vernon Baker
Street, Apt. No.; or PO Box No.  Senior Vice President, General Counsel
ArvinMeritor, Inc.
City, State, ZIP+4  2135 West Maple Road
Troy, MI 48084

7003 3110 0002 8440 7871

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Vernon Baker
Senior Vice President, General Counsel
ArvinMeritor, Inc.
2135 West Maple Road
Troy, MI 48084

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X M.L.Patterson    ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )  C. Date of Delivery
Mary Lou Patterson

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number    7003 3110 0002 8440 7871    ArvMerr
2135 W. Maple

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

Case 1:08-cv-02542 Document 1-2 Filed 05/05/2008 Page 51 of 103
Case 1:05-cv-05148 Document 1 Filed 09/08/2005 Page 45 of 58
Case 1:05-cv-05148 Document 70 Filed 06/21/2006 Page 43 of 58

# EXHIBIT
# A7

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 52 of 103
Case 1:05-cv-05148   Document 1-2   Filed 09/08/2005   Page 46 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 46 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

January 11, 2005

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7888

The Corporation Company
Registered Agent for ArvinMeritor, Inc.
30600 Telegraph Road
Bingham Farms, MI 48025

Re:    Notice of Intent to Pursue Legal Action
        (Amforge Site, Chicago, Illinois)

To Whom It May Concern:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 53 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 47 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 47 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2

Registered Agent for<br>ArvinMeritor

January 11, 2005

that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes.

cc:   Michael O. Leavitt, Administrator, USEPA
      Bharat Mathur, Regional Administrator, USEPA
      Renee Cipriano, Director, IEPA

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 54 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 48 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 48 of 58



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com™

| | | |
|---|---|---|
| Postage | $ | 60 |
| Certified Fee | | 2.30 |
| Return Receipt Fee (Endorsement Required) | | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 465 |

7003 3110 0002 8440 7888

Sent To
Street, Apt. No.;
or PO Box No.
City, State, ZIP+4

The Corporation Company
Registered Agent for ArvinMeritor, Inc.
30600 Telegraph Road
Bingham Farms, MI 48025

PS Form ...        ...ructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Corporation Company
Registered Agent for ArvinMeritor, Inc.
30600 Telegraph Road
Bingham Farms, MI 48025

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X The Corporation Co...     ☐ Agent
                            ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
                                   JAN ...

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   7003 3110 0002 8440 7888

PS Form 3811, August 2001        Domestic Return Receipt        102595-01-M-2509

# EXHIBIT
# A8

Case 1:08-cv-02542 Document 1-2 Filed 05/05/2008 Page 56 of 103
Case 1:05-cv-03148 Document 1 Filed 09/08/2005 Page 50 of 58
Case 1:05-cv-03148 Document 70 Filed 08/21/2006 Page 50 of 58

# O'Keefe Lyons & Hynes, LLC

30 North LaSalle Street
Suite 4100
Chicago, Illinois 60602
312.621.0400
Facsimile
312.621.0297

January 11, 2005

VIA CERTIFIED U.S. MAIL
7003 3110 0002 8440 7819

Kevin B. Hynes
Direct 312.422.9175
Fax 312.621.0297
kevinhynes@okeefe-law.com

Mr. Steven C. Graham
President
Graham Partners, Inc.
Chesterbrook Corporate Center
1325 Morris Drive, Suite 205
Wayne, PA 19087

Re:     Notice of Intent to Pursue Legal Action
              (Amforge Site, Chicago, Illinois)

To Mr. Graham:

This firm represents the City of Chicago. Pursuant to Section 7002(b) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b), this letter is to notify you that the City intends to pursue legal action against you seeking an order requiring you to remediate what is known as the Amforge Site. This complaint will also seek an order requiring you to reimburse the City for costs it has and continues to incur remediating the Site.

The evidence we have gathered to date indicates that your company or its predecessor was an owner/operator of the Site. The Amforge Site (the "Site") is located between 119th and 118th Streets at Loomis Street in the Pullman area of Chicago. The Site is approximately 18 acres in size and is the former location of the Amforge manufacturing facility.

Over the last few years, the City of Chicago has acquired the Site and other abandoned industrial properties in an effort to redevelop the Pullman area. After the City acquired the Site, the City's environmental consultants determined that the property is heavily contaminated with hazardous waste, as that term is defined in RCRA, and hazardous substances, as that term is understood under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Sampling results revealed the presence of, among other things, PCBs. The City has entered the Site in the Illinois EPA's Site Remediation Program ("SRP"). The SRP is Illinois' voluntary remediation program. The City is working toward obtaining a No Further Remediation letter based on industrial/commercial clean-up objectives. The Site, however, remains contaminated and poses an imminent and substantial endangerment to the surrounding community.

The complaint we have prepared seeks the recovery of approximately $1.5 million in past costs. The City, however, has yet to complete the remediation. Accordingly, the complaint also seeks a finding of liability for all future costs incurred at the Site. The complaint includes claims

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 57 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 51 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 51 of 58

# O'Keefe Lyons & Hynes, LLC

Page 2                                                                      Steven C. Graham

January 11, 2005

under RCRA, CERCLA, as well as the Illinois Environmental Protection Act and various municipal ordinances. While we appreciate the risks inherent in any litigation, we are confident that a judge will rule in the City's favor.

The City is willing to discuss settling this case before filing the complaint. We will, therefore, refrain from filing for 60 days. In the meantime, we look forward to your response.

Sincerely,

Kevin B. Hynes

cc:    Michael O. Leavitt, Administrator, USEPA
       Bharat Mathur, Regional Administrator, USEPA
       Renee Cipriano, Director, IEPA

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Steven C. Graham
President
Graham Partners, Inc.
Chesterbrook Corporate Center
1325 Morris Drive, Suite 205
Wayne, PA 19807

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent
☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
1/18/06

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number    7003 3110 0002 8440 7819

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509



Case 1:08-cv-02542     Document 1-2     Filed 05/05/2008     Page 59 of 103
Case 1:05-cv-05148     Document 1     Filed 09/08/2005     Page 53 of 58
Case 1:05-cv-05148     Document 70     Filed 06/21/2006     Page 53 of 58

# EXHIBIT
# A9

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 60 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 54 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 54 of 58



Bharat Mathur
Regional Administrator
Region 5 – USEPA
77 West Jackson Boulevard
Chicago, IL 60604

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)  C. Date of Delivery |
| 1. Article Addressed to:<br><br>Bharat Mathur<br>Regional Administrator<br>Region 5 – USEPA<br>77 West Jackson Boulevard<br>Chicago, IL 60604 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7003 3110 0002 8440 7901 | |
| PS Form 3811, August 2001    Domestic Return Receipt | 102595-01-M-2509 |

Case 1:08-cv-02542   Document 1-2   Filed 05/05/2008   Page 61 of 103
Case 1:05-cv-05148   Document 1   Filed 09/08/2005   Page 55 of 58
Case 1:05-cv-05148   Document 70   Filed 06/21/2006   Page 55 of 58

# EXHIBIT
# A10

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 62 of 103
Case 1:05-cv-05148    Document 17    Filed 09/02/2005    Page 56 of 58
Case 1:05-cv-05148    Document 70    Filed 08/21/2006    Page 56 of 58



Renee Cipriano
Director – Illinois EPA
1021 North Grand Avenue East
P.O. Box 19276
Springfield, Il 62794-9276

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. ■ Print your name and address on the reverse so that we can return the card to you. ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature X ☐ Agent ☐ Addressee B. Received by ( Printed Name ) C. Date of Delivery |
| 1. Article Addressed to: Renee Cipriano Director – Illinois EPA 1021 North Grand Avenue East P.O. Box 19276 Springfield, Il 62794-9276 | D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No IEPA JAN 1 3 2005 3. Service Type ☐ Certified Mail ☐ Express Mail ☐ Registered ☐ Return Receipt for Merchandise ☐ Insured Mail ☐ C.O.D. 4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number 7003 3110 0002 8440 7895 | |
| PS Form 3811, August 2001 | Domestic Return Receipt    102595-01-M-2509 |

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 63 of 103
Case 1:05-cv-05148    Document 70    Filed 09/08/2005    Page 57 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 57 of 58

# EXHIBIT
# A11

Case 1:08-cv-02542    Document 1-2    Filed 05/05/2008    Page 64 of 103
Case 1:05-cv-05148    Document 1    Filed 09/08/2005    Page 58 of 58
Case 1:05-cv-05148    Document 70    Filed 06/21/2006    Page 58 of 58



Michael O. Leavitt
Administrator – USEPA
1101A
USEPA Headquarters
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X ☐ Agent ☐ Addressee <br> B. Received by ( Printed Name)    C. Date of Delivery <br>  1-18-06 |
| 1. Article Addressed to: <br><br> Michael O. Leavitt <br> Administrator – USEPA <br> 1101A <br> USEPA Headquarters <br> Ariel Rios Building <br> 1200 Pennsylvania Avenue, N.W. <br> Washington, DC 20460 | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No <br><br><br> 3. Service Type <br> ☑ Certified Mail  ☐ Express Mail <br> ☐ Registered  ☐ Return Receipt for Merchandise <br> ☐ Insured Mail  ☐ C.O.D. <br> 4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number    7003 3110 0002 8440 7918 | 1200 Penn Ave |
| PS Form 3811, August 2001    Domestic Return Receipt | 102595-01-M-25 |

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT dated as of April 15, 1988 ("this Agreement"), by and among Nailite Acquisition Co., a Delaware corporation ("Buyer"), and Wilfred E. Davis, as Trustee under the Trust Agreement dated February 7, 1985, Richard A. Davis, Dallas Crick, Daryl A. Boyd, Elizabeth F. Davis and Diane Joseph Feldman ("Sellers").

The Sellers together own all of the issued and outstanding Common Stock, $10 par value per share (the "Company Common Stock"), of Nailite International, Inc., an Illinois corporation (the "Company"). Buyer desires to purchase, and the Sellers desire to sell, all of the Company Common Stock owned by the Sellers upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other consideration, the value, receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1

### Distribution of Certain Assets

Prior to the Closing Date (as defined in Article 3), the Company will distribute to the Sellers (or their designee) each of the assets set forth on the Distributed Assets Schedule attached hereto, and Sellers will assume any and all obligations and liabilities of the Company (whether known or unknown, accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted) arising out of transactions entered into prior to the Closing Date, or any action or inaction, or any state of facts existing at or prior to the Closing Date, including taxes with respect to or based upon transactions or events occurring prior to the Closing Date, except for (a) liabilities reflected in the December 31, 1987 balance sheet of the Company's Nailite International Division (the "Florida Division"), a copy of which has been delivered to Buyer prior to the date of this Agreement, (b) obligations under contracts or commitments described in the Disclosure Schedule under the caption "Contracts" or "Leases" (but not liabilities for breaches thereof) or under contracts and commitments entered into in the ordinary course of business which are not required to be disclosed thereunder (but not liabilities for breaches thereof), (c) liabilities which have arisen after the date of the balance sheet referred to in (a) above in the ordinary course of business of the Florida Division (none of which is a liability for breach of contract, breach of warranty, tort, infringement, claim or lawsuit), and (d) liabilities otherwise expressly

A0028858

EXHIBIT B

disclosed in this Agreement or in the Disclosure Schedule and not expressly assumed by Sellers herein (the "Assumed Liabilities").

## ARTICLE 2

### Purchase and Sale of Stock; Purchase Price

2.1 <u>Purchase and Sale of Stock</u>. Subject to the terms and conditions of this Agreement, each of the Sellers shall sell to Buyer, and Buyer shall purchase from each of the Sellers, the number of shares of Company Common Stock set forth opposite the respective Seller's signatures on the last page hereof, free and clear of all liens, charges, security interests, options, purchase rights, proxies, voting trusts and agreements, and other encumbrances.

2.2 <u>Purchase Price</u>. Subject to Section 2.3, the aggregate purchase price for all of the Company Common Stock shall be $12,370,000, of which (i) $10,870,000 will be payable by Buyer at the Closing by check or wire transfer of immediately available Chicago Federal Reserve Bank funds or the equivalent to the Sellers in the amounts set forth under Column A opposite the respective Seller's signatures on the last page hereof and (ii) $1,500,000 will be payable through the issuance of promissory notes by Buyer in the form of Exhibit A attached hereto (the "Notes") to each of Sellers in the principal amounts set forth under Column B opposite the respective Seller's signatures on the last page hereof.

2.3 <u>Adjustment to Purchase Price</u>.

(a) The Purchase Price shall be decreased by the excess, if any, of $3,700,000 over the Company's Net Asset Amount as determined pursuant to subparagraph (b) below and shall be increased by the excess, if any, of the Company's Net Asset Amount as so determined over $3,996,000. Any Purchase Price decrease shall be effected by a corresponding decrease in the principal amounts of each of the Notes allocated in proportion to the outstanding principal amount of the Notes immediately prior to such decrease, and the principal payment schedule set forth in the Notes shall be adjusted so that the decrease in the principal amount shall be applied to decrease the scheduled principal payments in the order in which such payments are scheduled to become due. Any Purchase Price increase up to $150,000 shall be effected by the issuance of promissory notes by Buyer to each Seller in the form of the Royalty Payment Promissory Notes described in Section 8.2(e) (the "Royalty Notes") with principal amounts equal to such increase allocated in proportion to the percentage ownership of Company Common Stock of Sellers as set forth on the signature page hereto. Any Purchase Price increase

A0028859

MBT455A

of $150,000 or more shall be effected by a corresponding increase
in the principal amounts of the Notes allocated in proportion to
the outstanding principal amounts of the Notes immediately prior
to such increase, and the principal payment schedule set forth in
the Notes shall be adjusted so that the increase in the principal
amounts shall be applied to increase the scheduled principal
payments in the order in which such payments are scheduled to
become due. In the event of any such decrease or increase, the
Royalty Notes, and the Notes if applicable, will be exchanged and
Buyer will issue new promissory notes as adjusted pursuant to
this Section 2.3. The term "Notes" shall hereinafter include all
such promissory notes other than any Royalty Notes or notes
issued in the form of the Royalty Notes.

(b) Within 60 days after the Closing Date (as defined
in Article 3), Buyer will prepare and deliver to Sellers a
balance sheet for the Florida Division as of the opening of
business on the Closing Date, audited by an independent certified
public accounting firm of national standing, together with a
statement setting forth Buyer's determination of the Net Asset
Amount. Within 30 days after receipt of such items, Sellers will
deliver to Buyer a detailed written statement describing their
objections (if any) to such balance sheet and determination of
the Net Asset Amount. If Sellers do not raise any objections
within such 30-day period, the audited balance sheet and Buyer's
determination of the Net Asset Amount will be final and binding
upon all parties. If Sellers do raise any such objections, Buyer
will make available to Sellers the work papers used in preparing
the audited balance sheet and in determining Buyer's calculation
of the Net Asset Amount and such other documents as Sellers may
reasonably request in connection with their review of the Net
Asset Amount. Buyer and Sellers shall use reasonable efforts to
resolve any such disputes. If a final resolution is not obtained
within 30 days after Sellers have submitted their objections to
Buyer, any remaining dispute will be resolved in accordance with
the provisions of this Section 2.3 by an accounting firm mutually
agreeable to Buyer and Sellers. If Buyer and Sellers are unable
to mutually agree on such an accounting firm, a "big-eight"
accounting firm will be selected by lot after eliminating one
firm designated as objectionable by each of Buyer and Sellers.
The determination of the accounting firm so selected will be
conclusive and binding upon the parties, and the fees and ex-
penses of such accounting firm will be paid one-half by Buyer and
one-half by Sellers. The final balance sheet prepared in accor-
dance with this subparagraph (b) and with subparagraph (c) below
and the related statement setting forth the Net Asset Amount are
referred to as the "Closing Balance Sheet."

A0028860

MBT455A

transfer to Buyer, with signatures guaranteed by an incorpo-
rated bank or trust company or a member firm of the New York
Stock Exchange, and with all required documentary stamps
affixed or provided for, at no expense to Buyer;

(b)  Buyer shall deliver to Sellers the Purchase Price
which is payable on the Closing Date in accordance with
Article 2 by issuance of the Notes and certified checks or
wire transfers of federal funds;

(c)  Buyer and Sellers shall enter into a Third
Priority Pledge Agreement in the form of Exhibit B hereto;
and

(d)  The parties shall deliver the other documents
required by the provisions of this Agreement to be delivered
at the Closing.

ARTICLE 4

Representations and Warranties of Buyer

As an inducement to Sellers to enter into this Agree-
ment, Buyer hereby represents and warrants to the Sellers as
follows:

4.1  Organization and Qualification.  Buyer is a
corporation duly organized, validly existing and in good standing
under the laws of its jurisdiction of incorporation, and has the
requisite corporate power to carry on its business as now con-
ducted.

4.2  Authority relative to This Agreement.  Buyer has
the requisite corporate power and authority to enter into this
Agreement and to carry out its obligations hereunder.  The execu-
tion and delivery of this Agreement by Buyer and the consummation
by Buyer of the transactions contemplated hereby have been duly
authorized by Buyer, and no other corporate proceedings on the
part of Buyer are necessary to authorize this Agreement and such
transactions.  This Agreement has been duly executed and deliv-
ered by Buyer and constitutes a valid and binding obligation of
Buyer, enforceable in accordance with its terms.  Buyer is not
subject to, or obligated under, any provision of (a) its Certifi-
cate of Incorporation or bylaws, (b) any agreement, arrangement
or understanding, (c) any license, franchise or permit or (d) any
law, regulation, order, judgment or decree, which would be
breached, or violated, or in respect of which a right of termina-
tion or acceleration or any encumbrance on any of its or any of
its subsidiaries' assets would be created, by its execution,
delivery and performance of this Agreement and the consummation

-5-

A0028862

MBT455A.

by it of the transactions contemplated hereby.  No authorization,
consent or approval of, or filing with, any public body, court or
authority is necessary on the part of Buyer for the consummation
by Buyer of the transactions contemplated by this Agreement.

ARTICLE 5

Representations and Warranties of Sellers

    As an inducment to Buyer to enter into this Agreement,
Sellers hereby represent and warrant to Buyer that:

    5.1  Organization and Qualification.  The Company is a
corporation duly organized, validly existing and in good standing
under the laws of the State of Illinois and has the requisite
corporate and other power and authority (including all licenses,
permits and authorizations) to own and operate its properties and
to carry on its business as now conducted and presently proposed
to be conducted.  The copies of the Company's Articles of Incor-
poration and bylaws which have been furnished by the Company to
Buyer prior to the date of this Agreement reflect all amendments
made thereto and are correct and complete.  The Company is
qualified to do business in every jurisdiction in which the
nature of its business or its ownership of property requires it
to be qualified, unless the failure to so qualify would not have
a material adverse effect upon its properties, assets, financial
condition, results of operation or business prospects.

    5.2  Authority Relative to This Agreement.  Each of
Sellers has the requisite power and capacity to enter into this
Agreement and to carry out its obligations hereunder.  This
Agreement has been duly executed and delivered by each Seller and
constitutes a valid and binding obligation of each Seller,
enforceable in accordance with its terms.  The Company is not
subject to, or obligated under, any provision of (a) its Articles
of Incorporation or bylaws, (b) any agreement, arrangement or
understanding, (c) any license, franchise or permit or (d) any
law, regulation, order, judgment or decree, which would be
breached or violated, or in respect of which a right of termina-
tion or acceleration or any encumbrance on any of its assets
would be created, by Sellers' execution, delivery and performance
of this Agreement and the consummation by it of the transactions
contemplated hereby.  No authorization, consent or approval of,
or filing with, any public body, court or authority is necessary
for the consummation by Sellers of the transactions contemplated
by this Agreement.

    5.3  Capitalization.  The authorized capital stock of
the Company consists of 100,000 shares of Company Common Stock.
As of the date hereof, 11,935.49 shares of Company Common Stock

-6-

A0028863

MBT455A

are issued and outstanding, all of which shares are validly issued, fully paid, nonassessable and are owned of record and beneficially by Sellers as set forth on the signature page of this Agreement, free and clear of any security interest, claims, liens, pledges, options, encumbrances, charges, agreements, voting trusts, proxies and other arrangements or restrictions whatsoever. Except as disclosed under the caption "Capitalization" in the Disclosure Schedule attached hereto, there are no options, warrants, conversion privileges or other rights, agreements, arrangements or commitments obligating the Company to issue or sell any shares of capital stock of the Company or securities or obligations of any kind convertible into or exchangeable for any shares of capital stock of the Company or of any other corporation, nor are there any stock appreciation, phantom or similar rights outstanding based upon the book value or any other attribute of the Company. The holders of outstanding shares of Company Common Stock are not entitled to any preemptive or other similar rights. Upon consummation of the transactions contemplated by this Agreement, Buyer will directly or indirectly own all of the capital stock of the Company, and there will be no options, warrants, conversion privileges or other rights, agreements, arrangements or commitments obligating the Company to issue or sell any shares of capital stock of the Company or of any other corporation.

5.4  Financial Statements.  Sellers have provided to Buyer copies of balance sheets as of December 31, 1987 (the "Latest Balance Sheet"), March 31, 1986 and March 31, 1985 and the related statements of income and home office and changes in financial positions for the periods then ended for the Company's Florida Division.  Each of such balance sheets and related financial statements has been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved and fairly present the financial position of the Company as of the dates thereof and the results of its operations and the changes in its financial position for the periods then ended.

5.5  Subsidiaries.  Except as set forth under the caption "Subsidiaries" in the Disclosure Schedule and on the Distributed Assets Schedule, the Company does not own any stock, partnership interest, joint venture interest, or any other security issued by any other corporation, organization or entity.

5.6  Absence of Undisclosed Liabilities.  As of the Closing, the Company does not have any obligations or liabilities (whether known or unknown, accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted) arising out of transactions heretofore entered into, or any action or inaction, or any state of facts existing at or prior to the Closing Date, including taxes with

-7-

A0028864

MBT455A.

respect to or based upon transactions or events heretofore occurring, except (a) obligations under contracts or commitments described in the Disclosure Schedule under the caption "Contracts" or "Leases" or (but not liabilities for breaches thereof) or under contracts and commitments entered into in the ordinary course of business which are not required to be disclosed thereunder (but not liabilities for breaches thereof), (b) liabilities reflected on the Latest Balance Sheet, (c) liabilities which have arisen after the date of the Latest Balance Sheet in the ordinary course of business (none of which is a liability for breach of contract, breach of warranty, tort, infringement, claim or lawsuit), (d) liabilities and obligations arising in connection with (i) Brunswick Hotel Condominium Association v. Brunswick Hotel Corporation, Pine Ridge Realty, Main Craft Inc., Applicator Sales & Services, Inc., Nailite, Inc. and Nailite International Inc., (ii) Robert Sake and Katherine Sake v. Nailite International, Inc., et al, (iii) the claim of Denenberg, Inc. against the Company and (iv) the claim of Attio Musacchio and Adrienne Musacchio against the Company (collectively, the "Existing Litigation") and (e) liabilities otherwise expressly disclosed in this Agreement or in the Disclosure Schedule.  The disclosure in this Section 5.6 of the Existing Litigation shall not limit the obligations of Sellers with respect thereto as set forth in Section 7.11.

   5.7  No Material Adverse Changes.  Since December 31, 1987, there has been no material adverse change in the assets, financial condition, operating results, customer, employee, supplier or franchise relations, business condition or prospects, or financing arrangements of the Company.

   5.8  Absence of Certain Developments.  Except as set forth under the caption "Developments" in the Disclosure Schedule, since December 31, 1987, the Company has not:

       (a)  redeemed or purchased, directly or indirectly, any shares of its capital stock, or declared or paid any dividends or distributions with respect to any shares of its capital stock;

       (b)  issued or sold any equity securities of it, securities convertible into or exchangeable for equity securities of it, warrants, options or other rights to acquire equity securities of it, or bonds or other securities of it;

       (c)  borrowed any amount or incurred or become subject to any material liability, except current liabilities incurred in the ordinary course of business;

       (d)  discharged or satisfied any material lien or encumbrance or paid any material liability, other than current liabilities paid in the ordinary course of business;

-8-

A0028865

MBT455A.

(e) mortgaged, pledged or subjected to any lien, charge or other encumbrance, any of its assets, except liens for current property taxes not yet due and payable;

(f) sold, assigned or transferred (including without limitation, transfers to any employees, shareholders or affiliates of the Company) any tangible assets, except in the ordinary course of business, or cancelled any debts or claims;

(g) sold, assigned or transferred (including, without limitation, transfers to any employees, shareholders or affiliates of the Company) any patents, trademarks, trade names, copyrights, trade secrets or other intangible assets, or disclosed any proprietary confidential information to any person other than Buyer;

(h) suffered any extraordinary loss or waived any rights of material value, whether or not in the ordinary course of business or consistent with past practice;

(i) taken any other action or entered into any other transaction other than in the ordinary course of business and in accordance with past custom and practice;

(j) suffered any theft, damage, destruction or casualty loss of or to any property or properties owned or used by it with a fair market value in excess of $5,000, whether or not covered by insurance;

(k) made or granted any bonus or any wage, salary or compensation increase to any director, officer, employee who earns more than $40,000 per year, group of employees or consultant or made or granted any increase in any employee benefit plan or arrangement, or amended or terminated any existing employee benefit plan or arrangement or adopted any new employee benefit plan or arrangement;

(l) made any capital expenditures or commitments therefor that aggregate in excess of $10,000;

(m) made any loans or advances to, or guarantees for the benefit of, any persons that aggregate in excess of $10,000; or

(n) made charitable contributions or political pledges which in the aggregate exceed $2,000.

5.9  Title to Properties.

(a)  The Company owns good and marketable title to each of the tangible properties and tangible assets reflected on the

-9-

A0028866

MBT455A.

Latest Balance Sheet or acquired since the date thereof, free and clear of all liens and encumbrances including without limitation environmental liens, except for (i) liens for current taxes not yet due and payable, (ii) the properties subject to the leases set forth under the caption "Leases" in the Disclosure Schedule and (iii) assets disposed of since the date of the Latest Balance Sheet in the ordinary course of business.

(b) (i) The real estate demised by the leases described under the caption "Leases" in the Disclosure Schedule constitutes all of the real estate used or occupied by the Company (the "Real Estate") and (ii) the Real Estate has access, sufficient for the conduct of the Company's businesses as now conducted or as presently proposed to be conducted, to public roads and to all utilities, including electricity, sanitary and storm sewer, potable water, natural gas and other utilities, used in the operations of the Company.

(c) The leases described under the caption "Leases" in the Disclosure Schedule are in full force and effect, and the Company has a valid and existing leasehold interest under each such lease for the term set forth therein. The Company has delivered to Company complete and accurate copies of each of the leases described under such caption and none of such leases has been modified in any respect, except to the extent that such modifications are disclosed by the copies delivered to Buyer. The Company is not in default, and no circumstances exist which could result in such default, under any of such leases; nor, to the knowledge of the Company, is any other party to any of such leases in default.

(d) All of the buildings, machinery, equipment and other tangible assets necessary for the conduct of the Company's business are in good condition and repair, ordinary wear and tear excepted, and are usable in the ordinary course of business. The Company owns, or leases under valid leases, all buildings, machinery, equipment and other tangible assets necessary for the conduct of its business.

(e) The Company is not in violation of any applicable zoning ordinance or other law, regulation or requirement relating to the operation of any properties used in the operation of its business, including without limitation applicable environmental protection and occupational health and safety laws and regulations, and the Company has not received any notice of any such violation, or of the existence of any condemnation proceeding with respect to any properties owned or leased by the Company.

5.10 _Accounts Receivable_. The Company's notes and accounts receivable recorded on the Closing Balance Sheet will be valid receivables collected within 90 days after the Closing Date

-10-

A0028867

MBT455A.

in the aggregate amount recorded therefor on the Closing Balance Sheet, subject to no valid counterclaims or setoffs, net of any applicable bad debt reserve properly recorded on the Closing Balance Sheet.

   5.11  <u>Inventories</u>.  The inventories of the Company recorded on the Closing Balance Sheet consist of a quantity and quality usable and salable in the ordinary course of business, is not slow-moving as determined in accordance with past practices, obsolete or damaged, is merchantable and fit for its particular use, and is not defective.

   5.12  <u>Tax Matters</u>.  Except as set forth under the caption "Tax Matters" in the Disclosure Schedule, the Company has filed all federal, foreign, state, county and local income, excise, property, sales and other tax returns which are required to be filed by it, and all such returns are true and correct; the Company's provisions for taxes on the Latest Balance Sheet are sufficient for all accrued and unpaid taxes as of the date of such balance sheet; the Company has paid all taxes due and payable by it or which it is obligated to withhold from amounts owing to any employee, creditor, or third party; the Company has not waived any statute of limitations in respect of taxes relating to any of their businesses or agreed to any extension of time with respect to a tax assessment or deficiency relating to any of their businesses; the assessment of any additional taxes relating to its business for periods for which returns have been filed is not expected; and there are no unresolved questions or claims concerning the tax liability of the Company.  The Company has not made an election under §341(f) of the Internal Revenue Code of 1986, as amended.

   5.13  <u>Contracts and Commitments</u>.

   (a)  Except as set forth under the caption "Contracts" in the Disclosure Schedule, the Company is not a party to any: (i) collective bargaining agreement or contract with any labor union; (ii) bonus, pension, profit sharing, retirement, or other form of deferred compensation plan; (iii) hospitalization insurance or similar plan or practice, whether formal or informal; (iv) contract for the employment of any officer, individual employee, or other person on a full-time or consulting basis or relating to severance pay for any such person; (v) agreement or indenture relating to the borrowing of money in excess of $5,000 or to mortgaging, pledging or otherwise placing a lien on any of the assets of the Company; (vi) guaranty of any obligation for borrowed money or otherwise, other than endorsements made for collection; (vii) lease or agreement under which it is lessor of, or permits any third party to hold or operate, any property, real or personal, for an annual rental in excess of $5,000; (viii) lease or agreement under which it is lessee of, or holds

-11-

A0028868

MBT455A.

or operates any property, real or personal, owned by any other party for an annual rental in excess of $5,000; (ix) contract or group of related contracts with the same party for the purchase of products or services, under which the undelivered balance of such products and services has a purchase price in excess of $50,000; (x) contract or group of related contracts with the same party for the sale of products or services under which the undelivered balance of such products or services has a sales price in excess of $50,000; (xi) other contract or group of related contracts with the same party continuing over a period of more than six months from the date or dates thereof, either not terminable by it on 30 days' or less notice without penalty or involving more than $50,000; (xii) contract which prohibits the Company from freely engaging in business anywhere in the world; (xiii) contract relating to the distribution of the Company's products; (xiv) franchise agreement; (xv) contract, agreement or understanding with any shareholder who beneficially owns 5% or more of the Company Common Stock or with any officer, director or employee (other than for employment on customary terms); (xvi) contract, agreement or understanding with any of Sellers; (xvii) license agreement or agreement providing for the payment or receipt of royalties or other compensation by the Company in connection with the proprietary rights listed under the caption "Proprietary Rights" in the Disclosure Schedule; or (xviii) other agreement material to the Company's business or not entered into in the ordinary course of business.

(b)  Except as specifically disclosed under the caption "Contracts" in the Disclosure Schedule, (i) since the date of the Latest Balance Sheet, no customer or supplier has indicated that it will stop or decrease the rate of business done with the Company, except for changes in the ordinary course of the Company's businesses; (ii) the Company has performed all obligations required to be performed by them in connection with the contracts or commitments required to be disclosed under such caption and is not in receipt of any claim of default under any contract or commitment required to be disclosed under such caption; (iii) the Company has no present expectation or intention of not fully performing any obligation pursuant to any contract or commitment or commitment set forth under such caption; and (iv) neither the Company nor any Seller has any knowledge of any breach or anticipated breach by any other party to any contract or commitment set forth under such caption.

(c)  Prior to the date of this Agreement, Buyer has been supplied with a true and correct copy of each written contract or commitment, and a written description of each oral contract or commitment, referred to under the caption "Contracts" in the Disclosure Schedule, together with all amendments, waivers or other changes thereto.

-12-

A0028869

MBT455A.

     5.14 <u>Proprietary Rights</u>. Except as set forth under the caption "Proprietary Rights" in the Disclosure Schedule, there are no patents, patent applications, trademarks, service marks, trade names, corporate names, copyrights, trade secrets or other proprietary rights owned by the Company or necessary to the conduct of the Company's businesses as now conducted. The Company owns and possesses all right, title and interest, or a valid license, in and to the proprietary rights set forth under such caption except as otherwise specified under such caption. The Disclosure Schedule describes under such caption all proprietary rights which have been licensed to third parties and those proprietary rights which are licensed from third parties. The Company has taken all necessary action to protect the Company owned proprietary rights set forth under such caption. The Company has not received any notice of, nor is it aware of any facts which indicate a likelihood of, any infringement, misappropriation, or conflict from any third party with respect to the proprietary rights which are listed; the Company has not infringed, misappropriated or otherwise conflicted with any proprietary rights of any third parties, nor is it aware of any infringement, misappropriation or conflict which will occur in the continued operation of the Company; Sellers are not aware of any infringement, misappropriation or conflict on the part of any third party with respect to any proprietary rights which are listed; and no claim by any third party contesting the validity of any proprietary rights listed under such caption has been made, is currently outstanding, or to the best knowledge of the Company or Sellers is threatened.

     5.15 <u>Litigation</u>. Except as set forth under the caption "Litigation" in the Disclosure Schedule, there are no actions, suits, proceedings, orders or investigations pending or, to the knowledge of Sellers, threatened against the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, and there is no basis known to the Company or Sellers for any of the foregoing. Except as set forth under such caption, the Company has not received any opinion or legal advice to the effect that the Company is exposed from a legal standpoint to any liability or disadvantage which may be material to it or its prospects.

     5.16 <u>Brokerage</u>. Except as set forth under the caption "Brokerage" in the Disclosure Schedule, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Company or by Sellers. The disclosure of any such claims in the Disclosure Schedule shall not limit the obligation of Sellers with respect to all such claims and for purposes of Section 7.2

A0028870

MBT455A.

this Section 5.16 shall be deemed not be provide an exception for any such claims.

5.17 <u>Employees</u>. To the best knowledge of the Company and the Sellers, (i) no key executive employee of the Company (other than Wilfred E. Davis and Richard A. Davis), and no group of the Company's employees (other than Wilfred E. Davis and Richard A. Davis), has any plans to terminate employment with the Company, (ii) the Company has complied with all laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the payment of social security and other taxes and including further without limitation the Immigration Reform and Control Act of 1986 and (iii) the Company has no material labor problems pending and their labor relations are satisfactory.

5.18 <u>Employee Benefit Plans</u>. With respect to all employees and former employees of the Company, the Company does not presently maintain, contribute to or have any liability (including current or potential multiemployer plan withdrawal liability) under any (i) nonqualified deferred compensation or retirement plan or arrangement which is an "employee pension benefit plan" as such term is defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) qualified defined contribution retirement plan or arrangement which is an employee benefit plan, (iii) qualified defined benefit pension plan or arrangement which is an employee pension benefit plan, (iv) "multiemployer plan" as such term is defined in Section 3(37) of ERISA, (v) unfunded or funded medical, health or life insurance plan or arrangement for present or future retirees or present or future terminated employees which is an "employee welfare benefit plan" as such term is defined in Section 3(1) of ERISA, or (vi) any other employee welfare benefit plan.

5.19 <u>Insurance</u>. The Disclosure Schedule, under the caption "Insurance," lists and briefly describes each insurance policy maintained by the Company with respect to its properties and assets and sets forth the date of expiration of each such insurance policy. All of such insurance policies are in full force and effect and the Company is not in default with respect to its obligations under any of such insurance policies. The insurance coverage of the Company is customary for corporations of similar size engaged in similar lines of businesses.

5.20 <u>Affiliate Transactions</u>. Except as set forth under the caption "Affiliate Transactions" in the Disclosure Schedule, no "Affiliate" has any agreement with the Company (other than normal employment arrangements) or any interest in any property, real, personal or mixed, tangible or intangible, used in or pertaining to the business of the Company. The term "Affiliate"

-14-

A0028871

MBT455A.

shall mean any officer, director or shareholder of the Company or any member of the immediate family of any such officer, director or shareholder, or any entity in which any of such persons owns any beneficial interest (other than a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than 5% of the stock of which is beneficially owned by any of such persons). For purposes of the preceding sentence, the members of the immediate family of an officer, director or shareholder shall consist of the spouse, parents, children, siblings, mothers- and fathers-in-law, sons- and daughters-in-law, and brothers- and sisters-in-law of such officer or director.

5.21  Customers and Suppliers. The Disclosure Schedule, under the caption "Customers and Suppliers," lists the 10 largest customers and suppliers of the Company for the 1987 fiscal year and sets forth opposite the name of each such customer and supplier the approximate percentage of consolidated net sales attributable to such customer or supplier.

5.22  Officers and Directors; Bank Accounts. The Disclosure Schedule, under the caption "Officers and Directors," lists all officers and directors of the Company, all persons to whom the Company has given powers of attorney or agency authority, and all of the Company's bank accounts, safe-deposit boxes and lock boxes (designating each authorized signer).

5.23  Compliance with Laws; Permits; Certain Operations. The Company and its officers, directors, agents and employees have complied in all respects with all applicable laws and regulations of foreign, federal, state and local governments and all agencies thereof which affect the businesses or any owned or leased properties of the Company and to which the Company may be subject, and no claims have been filed against the Company alleging a violation of any such law or regulation, except as set forth in the Disclosure Schedule under the caption "Compliance." The Company has not given or agreed to give any money, gift or similar benefit (other than incidental gifts of articles of nominal value) to any actual or potential customer, supplier, governmental employee or any other person in a position to assist or hinder the Company in connection with any actual or proposed transaction. The Company holds all of the permits, licenses, certificates and other authorizations of foreign, federal, state and local governmental agencies required for the conduct of their businesses. In particular, but without limiting the generality of the foregoing, the Company has not violated, or received a notice or charge asserting any violation of, the Occupational Safety and Health Act of 1970, or any other state or federal acts (including rules and regulations thereunder) regulating or otherwise affecting employee health and safety or the environ- ment. The Company has not knowingly or unknowingly stored,

A0028872

MBT455A.

handled, emitted or disposed of any chemical, toxic or hazardous wastes or substances in any manner which may form the basis for any present or future claim, demand or action seeking clean up of any site, location, or body of water, surface or substance.

5.25 <u>Disclosure</u>. Neither this Agreement nor any of the attachments or exhibits hereto nor the Disclosure Schedule contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading, and there is no fact which has not been disclosed to Buyer of which Sellers or any officer or director of the Company is aware which materially affects adversely or could reasonably be anticipated to materially affect adversely the businesses, including operating results, assets, customer relations, employee relations and business prospects, of the Company.

5.26 <u>Investment Representations Regarding Notes</u>. In connection with the receipt of a Note hereunder from Buyer, each Seller hereby represents and warrants to the Company and Buyer that:

(i) Such Seller has reviewed this Agreement and a Note;

(ii) Such Seller has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of his Note, has had full access to such other information concerning Buyer and the Company as he has requested and possesses substantial information about, and familiarity with, the Company as a result of his status as a shareholder and/or employee or former employee of the Company;

(iii) Such Seller has such knowledge and experience in business and financial matters that he is capable of evaluating the merits and risks of the investment in his Note to be made pursuant to this Agreement, and such Seller is able to bear the economic risk of the investment in his Note for an indefinite period of time;

(iv) Such Seller is acquiring his Note hereunder for his own account with the present intention of holding such security for investment purposes and has no intention of selling such security in a public distribution in violation of federal or state securities laws; and

(v) Such Seller is an "Accredited Investor" as such term is defined in Regulation D promulgated under the Securities Act of 1933.

-16-

A0028873

MBT455A.

At Buyer's request, each Seller will appoint a purchaser or offeree representative reasonably satisfactory to Buyer and will complete such other documents as Buyer reasonably requests in order to perfect an exemption from registration under federal and state securities laws.

5.27  Closing Date.  All of the representations and warranties of Sellers in this Article 5 and elsewhere in this Agreement and all information delivered in the Disclosure Schedule or in any certificate delivered by Sellers to Buyer are true and correct on the date of this Agreement and will be true and correct on the Closing Date.

ARTICLE 6

Conduct of Business Pending the Closing

6.1  Conduct of Business Pending the Closing.  Sellers covenant and agree that, prior to the Closing Date, unless Buyer shall otherwise agree in writing or as otherwise expressly contemplated or permitted by this Agreement:

(a)  The businesses of the Company shall be conducted only in, and the Company shall not take any action except in, the ordinary course, on an arm's-length basis and in accordance in all material respects with all applicable laws, rules and regulations and past custom and practice, and the Company shall maintain its facilities;

(b)  The Company shall not, directly or indirectly, do or permit to occur any of the following: (i) issue, sell, pledge, dispose of or encumber (A) any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its capital stock, except for issuances upon the exercise of options or warrants outstanding on the date hereof, or (B) any of its assets, except in the ordinary course of business; (ii) amend or propose to amend its Articles of Incorporation or bylaws; (iii) split, combine or reclassify any outstanding shares of Company Common Stock, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to shares of Company Common Stock; (iv) redeem, purchase or acquire or offer to acquire any shares of Company Common Stock or other securities of the Company; (v) acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership, joint venture or other business organization or division or material assets thereof; (vi) incur any indebtedness for borrowed money or issue any debt securities except the borrowing of working capital in the ordinary course of business and consistent with past practice or (vii) enter into or propose to enter into, or modify or propose to modify, any

-17-

A0028874

MBT455A.

agreement, arrangement or understanding with respect to any of the matters set forth in this Section 6.1(b);

(c) The Company shall not directly or indirectly, (i) enter into or modify any contract, agreement or understanding with any of the Sellers; (ii) enter into or modify any employment, severance or similar agreements or arrangements with, or grant any bonuses, salary increases, severance or termination pay to, any officers or directors or consultants; or (iii) in the case of employees who are not officers or directors or consultants and who earn in excess of $40,000 per year, take any action with respect to the grant of any bonuses, salary increases, severance or termination pay or with respect to any increase of benefits payable in effect on the date hereof;

(d) The Company shall not adopt or amend any bonus, profit sharing, compensation, stock option, pension, retirement, deferred compensation, employment or other employee benefit plan, trust, fund or group arrangement for the benefit or welfare of any employees or any bonus, profit sharing, compensation, stock option, pension, retirement, deferred compensation, employment or other employee benefit plan, agreement, trust, fund or arrangements for the benefit or welfare of any director;

(e) The Company shall use its best efforts to cause its current insurance (or reinsurance) policies not to be cancelled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect; and

(f) The Company (i) shall use its best efforts to preserve intact its business organization and good will, keep available the services of its officers and employees as a group and maintain satisfactory relationships with suppliers, distributors, customers and others having business relationships with it; (ii) shall confer on a regular and frequent basis with representatives of Buyer to report operational matters and the general status of ongoing operations; (iii) shall not take any action which would render, or which reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue at, or at any time prior to, the Closing Date; (iv) shall notify Buyer of any emergency or other change in the normal course of its business or in the operation of its properties and of any governmental or third party complaints, investigations or hearings (or communications indicating that the same may be contemplated) if such emergency, change, complaint, investigation or hearing would be material, individually or in the aggregate, to the business, operations or financial condition

-18-

A0028875

MBT455A.

of the Company or to Seller's or Buyer's ability to consummate
the transactions contemplated by this Agreement; and (v) shall
notify Buyer if the Company shall discover that any representa-
tion or warranty made by it in this Agreement was when made, or
has subsequently become, untrue.

ARTICLE 7

Additional Agreements

7.1  Survival.   The  representations,   warranties,
covenants and agreements set forth in this Agreement or in any
writing delivered to Buyer by Sellers or to Sellers by Buyer in
connection with this Agreement will survive the consummation of
the transactions contemplated hereby, regardless of any investi-
gation made by or on behalf of any of the parties hereto or the
results of any such investigation, and the participation of any
party in such consummation (and any waiver of the condition to
such participation that a representation or warranty of any other
party be true and correct) shall not constitute a waiver of any
representation or warranty of any other party.

7.2  Indemnification.

(i)  The Sellers, subject to the conditions and provi-
sions herein set forth, jointly and severally agree to indemnify,
defend, and hold harmless Buyer ("Buyer" meaning, solely for the
purpose of this Section 7.2, Buyer and all subsidiaries and
affiliates of Buyer, including, without limitation, the Company)
from and against all demands, claims, actions or causes of
action, assessments, losses, damages, liabilities, costs and
reasonable expenses, including, without limitation, interest,
penalties and reasonable attorneys' fees and expenses (collec-
tively, "Claims"), asserted against or imposed upon or incurred
by Buyer resulting from, relating to, or by reason of:

(A)  any facts constituting a breach of any repre-
sentation or warranty of the Sellers contained in Article 5
or made pursuant to this Agreement or in the closing certif-
icates referred to in Section 8.3;

(B)  any failure by any of the Company or the Sellers
to perform or observe any agreement or provision contained
in this Agreement or any Exhibit hereto on its or his part
to be performed or observed;

(C)  any Assumed Liabilities; or

(D)  any and all federal, state and local income taxes
arising out of operations or relating to periods ending on

-19-

A0028876

MBT455A.

or prior to the Closing Date, including without limitation any such taxes relating to the distribution of assets and assumption of liabilities pursuant to Article 1.

(ii)  The obligations of the Sellers to indemnify Buyer against any Claims resulting from, relating to, or by reason of (A) or (B) above shall be limited to claims as to which written notice thereof shall have been given to the Sellers on or prior to the second anniversary of the Closing Date, whether or not the damage has been actually sustained; *provided, however,* that the limitation of liability of the Sellers provided for in this Section shall not apply to any claims arising from the breach of any warranty or representation under Section 5.12 hereof.

(iii)  Buyer, subject to the conditions and provisions herein set forth, agrees to indemnify, defend, and hold harmless the Sellers from and against all Claims asserted against or imposed upon or incurred by the Sellers resulting from, relating to, or by reason of:

(A)  any facts constituting a breach of any representation or warranty of the Buyer contained in Article 4 or made pursuant to this Agreement or in the closing certificate referred to in Section 8.2; or

(B)  any failure by Buyer to perform or observe any agreement or provision contained in this Agreement or any Exhibit hereto on its part to be performed or observed.

The obligation of the Buyer to indemnify the Sellers against any claim shall be limited to Claims as to which written notice thereof shall have been given to Buyer on or prior to the second anniversary of the Closing Date, whether or not the damage has been actually sustained.

(iv)  The provisions for indemnity contained in Sections 7.2(i) (other than subparagraphs (C) and (D) and 7.2(iii) shall be effective only after and to the extent that valid and enforceable Claims thereunder exceed $100,000 (the "Deductible Amount"); *provided, however,* that the Deductible Amount shall not apply to any Claims by Buyer for the breach of Sections 5.1, 5.10, 5.12, 5.16, 5.23 or 7.3.

(v)  If the party seeking indemnification (the "Claiming Party") shall be presented with or have actual notice of any action, claim or demand which gives rise (or may give rise) to a claim for indemnification under this Section 7.2 against another party (the "Indemnifying Party"), then the Claiming Party shall within 30 days thereafter notify the Indemnifying Party in writing thereof (which notice shall, to the extent possible, specify the details of the claim), it being understood and agreed

A0028877

MBT455A.

that any delay of the Claiming Party to so notify the Indemnify-
ing Party shall not relieve the Indemnifying Party from liability
hereunder, except and solely to the extent the Indemnifying Party
is damaged by such delay.  Following such notice, the Indemnify-
ing Party shall have the right, after acknowledging in writing to
the Claiming Party that the Indemnifying Party is indemnifying
the Claiming Party, at its sole cost and expense, to contest or
defend such action, claim or demand, through attorneys, accoun-
tants and others of its own choosing, and satisfactory to the
Claiming Party, and in the event it elects to do so, it shall
promptly notify the Claiming Party of its intent to contest or
defend such action, claim or demand.  If, within 5 days following
such notice from the Claiming Party, the Indemnifying Party has
not notified the Claiming Party that it will contest or defend
such action, claim or demand, the Claiming Party shall have the
right to (a) authorize attorneys satisfactory to it to represent
it in the defense thereof, and/or (b) at any time upon additional
notice to the Indemnifying Party, to settle, compromise or pay
such action, claim or demand, in which event the Claiming Party
shall be entitled to indemnification therefor as provided in
either Sections 7.2(i) or 7.2(iii) above, as the case may be.  So
long as the Indemnifying Party is actively and diligently con-
ducting such defense or contest, such actions, claims or demands
shall not be settled, compromised or paid by the Claiming Party
without the Indemnifying Party's prior written consent, unless
such action, claim or demand has been adjudicated by a final and
unappealed order of a court of competent jurisdiction.  Any
action, claim or demand may be settled, compromised or paid by
the Indemnifying Party at any time without the consent of the
Claiming Party; provided, however, that in the event Buyer is the
Claiming Party and (a) any such settlement, compromise or payment
would involve relief of other than the payment of money damages,
(b) the subject matter of any such action, claim or demand
relates to the ongoing business of Buyer and if, were such
action, claim or demand to be adversely decided against Buyer,
its ongoing business would be adversely affected, or (c) it
appears to Buyer, either at the time it is made a defendant in or
a party to any such action, claim or demand or at any time
thereafter, that Sellers would not, because of the limitations in
Section 7.2(ii) or 7.2(iv), and taking into account other then
existing or past matters for which Sellers are liable under this
Agreement, be liable hereunder for the full potential liability
under any such action, claim or demand, then the Indemnifying
Party may not enter into any such settlement or make any such
compromise or payment without the prior written consent of Buyer.

(vi)   In addition to any other remedy Buyer may have to
enforce the provisions of this Section 7.2, the principal amount
of the Notes and any accrued interest thereunder may be offset to
satisfy Sellers' obligations under this Section 7.2.

A0028878

MBT455A.

7.3  Expenses.  Each party shall pay their own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby.  Sellers represent and warrant to Buyer that the Company will not be charged for any expenses incurred by Sellers or incurred on their behalf in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated by this Agreement.

7.4  Additional Agreements.  Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including using reasonable efforts to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings and submissions of information requested by governmental authorities.  Buyer agrees to cause all payments received by the Company after the Closing Date on account of Distributed Assets described in Article 1. to be forthwith transferred to Sellers.

7.5  No Negotiations, etc.  Sellers shall not solicit, initiate or encourage submission of any proposal or offer from any person or entity (including any of its or their officers or employees) relating to any liquidation, dissolution, recapitalization, merger, consolidation or acquisition or purchase of all or a material portion of the assets of, or any equity interest in, the Company or other similar transaction or business combination involving the Company, or participate in any negotiations regarding, or furnish to any other person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other person or entity to do or seek any of the foregoing. Sellers shall promptly notify Buyer if any such proposal or offer, or any inquiry or contact with any person with respect thereto, is made and shall promptly provide Buyer with such information regarding such proposal, offer, inquiry or contact as Buyer may request.

7.6  Notification of Certain Matters.  Each party shall give prompt notice to the others of (a) the occurrence or failure to occur of any event, which occurrence or failure would be likely to cause any representation or warranty on its part contained in this Agreement to be untrue or inaccurate at, or at any time prior to, the Closing Date, and (b) any material failure of such party, or any officer, director, shareholder, employee or agent thereof, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

A0028879

MBT455A.

    7.7  <u>Access to Information; Confidentiality</u>.  Sellers
will permit Buyer and its accounting, legal and other representa-
tives to conduct an investigation and evaluation of the Company,
will provide such assistance as is reasonably requested and will
give access at reasonable times to all things related to the
Company's businesses and assets.  If the contemplated transaction
is not consummated, Buyer will not use or disclose to any third
parties, and will use reasonable efforts to prevent any of its
employees, agents or representatives from using or disclosing to
any third parties (except to the extent publicly available or
obtainable from independent sources or required by law), any
information obtained in their investigation of the Company.  If
the transactions contemplated by this Agreement are consummated,
Buyer shall deliver to each Seller, on a monthly basis, monthly
financial statements of the Company so long as the Notes remain
outstanding and weekly reports of accounts receivable receipts so
long as the Royalty Notes remain outstanding, provided each
Seller shall maintain the confidentiality of and will not use or
disclose to any third party any such financial statements,
reports or any other confidential or proprietary information
regarding the Company.

    7.8  <u>Collection of Accounts Receivable</u>.

         (a)  Buyer shall use its best efforts to collect
all of the accounts receivables from customers reflected on the
Closing Balance Sheet (the "Accounts Receivable").  Buyer shall
furnish Sellers with all such records and other information as
Sellers may require to verify the amounts collected by Buyer with
respect to the Accounts Receivable.  For the purpose of determin-
ing amounts collected by Buyer with respect to the Accounts
Receivable, (i) if a payment is specified by an account debtor as
being in payment of a specific invoice of the Company, the
payment shall be applied to that invoice and (ii) in the absence
of a bona fide dispute between an account debtor and the Company,
all payments by an account debtor that are not specified as being
in payment of a specific invoice shall first be applied to the
oldest outstanding invoice due form that account debtor.  Buyer
shall not be required to retain a collection agency, bring any
suit or take any other action out of the ordinary course of
business to collect any of the Accounts Receivable.  Buyer shall
not compromise, settle or adjust the amount of any of the Ac-
counts Receivable or request any account debtor to specify any
payment be applied to a specific invoice, without the prior
written consent of Sellers which shall not be unreasonably
withheld.

         (b)  To the extent that Buyer has not collected
the full amount of the Accounts Receivable reflected on the
Closing Balance Sheet (less the allowance for bad debts set forth
thereon) within 90 days after the Closing Date, Buyer shall have

-23-

A0028880

MBT455A.

the right to require indemnification from Sellers pursuant to
Section 7.2, by reason of the breach of the representation set
forth in Section 5.10, with respect to all such Accounts Receiv-
able remaining outstanding, and concurrently with the payment by
Sellers of such indemnification, Buyer shall reassign to Sellers
all Accounts Receivable remaining outstanding. This Section 7.8
and Section 7.2 will be Buyer's sole remedy with respect to any
uncollected Accounts Receivable.

(c) In the event that after the Closing Date
Sellers shall receive any remittance from or on behalf of any
account debtor with respect to the Accounts Receivable (excluding
any Accounts Receivable reassigned to Sellers), Sellers shall
endorse without recourse except as set forth in subsection (b)
above such remittance to the order of Buyer and forward same to
Buyer promptly upon receipt thereof.

7.9. Restriction on Transfer of the Notes. Each Seller
hereby represents that he is acquiring the Note issued to such
Seller hereunder for his own account with the present intention
of holding such Note for purposes of investment, and that he has
no intention of selling such note in a public distribution in
violation of the federal securities laws or any applicable state
securities laws. No Seller shall transfer any Note (other than
to members of a such Seller's immediate family (as defined in
Section 5.20), to any trustee, administrator, executor or guar-
dian of an estate, or to another Seller) without written consent
of the Company and the delivery of written notice to Buyer
describing in reasonable detail the transfer or proposed trans-
fer, together with an opinion (reasonably satisfactory to Buyer)
of counsel (reasonably satisfactory to Buyer) to the effect that
such transfer may be effected without registration of such Note
under state or federal securities law.

7.10. Further Transfers. Sellers will execute and
deliver such further instruments of conveyance and transfer and
take such additional action as Buyer may reasonably request to
effect, consummate, confirm or evidence the transfer to Buyer of
the Company Common Stock, and Sellers will execute such documents
as may be necessary to assist Buyer in preserving or perfecting
its and the Company's rights in the Company Common Stock.

7.11. Existing Litigation. Notwithstanding any other
provision of this Agreement, Sellers jointly and severally agree
to indemnify, defend and hold harmless Buyer and the Company from
and against all demands, claims, actions, or causes of action,
losses, damages, liabilities, costs and reasonable expenses,
including without limitation interest, penalties and reasonable
attorney's fees and expenses, asserted against or imposed upon or
incurred by Buyer and/or the Company resulting from, relating to
or by reason of the Existing Litigation or any related action or

-24-

A0028881

MBT455A.

claim.  In addition to any other remedy Buyer may have to enforce
the provisions of this Section 7.11, the principal amount of the
Notes and any accrued interest thereunder may be offset to
satisfy Sellers' obligations under this Section 7.11.  Sellers
hereby agree to assume the defense of the Company in the Existing
Litigation and to keep Buyer informed of all material
developments relating thereto and to respond to Buyer's inquiries
relating thereto.  Sellers will not, however, enter into any
settlement or compromise or make any payment with respect to the
Existing Litigation without the prior written consent of Buyer.

    7.12  Preservation of Records.  Unless otherwise con-
sented to in writing by Sellers, Buyer will not, for a period of
three years from the Closing Date, destroy or otherwise dispose
of any of the Company's books and records existing on the Closing
Date without first offering to surrender such books and records
or any portion thereof which Buyer may intend to destroy or
dispose of to Sellers.  Buyer will allow Sellers and Sellers'
representatives, attorneys and accountants access to any such
books and records so acquired by Buyer upon reasonable request
and during Buyer's and the Company's normal business hours for
examination and/or copying.

    7.13  Health Insurance.  To the extent permitted by
applicable law and by the Company's health insurance plan, Buyer
shall, for a period of 18 months following the Closing Date,
cause the Company to continue coverage under the Company's health
insurance plan for each of Sellers and Wilfred E. Davis; provided
that Sellers and Wilfred E. Davis shall pay the premiums in
connection therewith.

    7.14  Designation of Representative.  Each Seller by
execution hereof hereby irrevocably appoints Wilfred E. Davis as
such Seller's representative (the "Representative") in connection
with this Agreement and the transactions contemplated hereby and
as such Seller's purchaser and offeree representative in
connection with the issuance of the Notes and agrees to be bound
by the actions of the Representative permitted hereunder.  In the
event of the Representative's (or his successor's) death, or
resignation or incapacity to discharge the functions of the
Representative, Sellers holding a majority of the outstanding
principal amount of the Notes will have the right to designate,
by written notice to Buyer, a successor representative to act as
Representative.  Each Seller hereby designates the Representative
(as appointed from time to time) to be his attorney-in-fact for
the purpose of taking such action as may be necessary or
appropriate to effectuate the duties of the Representative as set
forth herein and authorizes the Representative to execute and
deliver any and all documents in the name and on the behalf of
such Seller as may be necessary to carry out the provisions of
this Agreement.

A0028882

MBT455A.

# ARTICLE 8

## Conditions

8.1 Conditions to Obligations of Each Party. The respective obligations of each party to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) there shall have been no law, statute, rule or regulation, domestic or foreign, enacted or promulgated which would make consummation of the transactions contemplated hereby illegal;

(b) no injunction or other order entered by a United States (state or federal) court of competent jurisdiction shall have been issued and remain in effect which would prohibit consummation of the transactions contemplated hereby; and

(c) no party hereto shall have terminated this Agreement as permitted herein.

8.2 Additional Conditions to Obligation of Sellers. The obligation of the Sellers to effect the transactions contemplated hereby is also subject to the following conditions:

(a) the representations and warranties of Buyer set forth in Article 4 shall be true and correct as of the Closing Date as if made at and as of the Closing Date, and Buyer shall in all material respects have performed its obligation and agreement and complied with each covenant to be performed and complied with by it hereunder at or prior to the Closing Date;

(b) Buyer shall have furnished to the Company a certificate in which Buyer shall certify that the conditions set forth in Section 8.2(a) have been fulfilled;

(c) Buyer shall have furnished to the Company (i) a copy of the text of the resolutions by which the corporate action on the part of Buyer necessary to approve this Agreement and the transactions contemplated hereby were taken, (ii) certificates executed on behalf of Buyer by its corporate secretaries or one of its assistant corporate secretaries certifying to Sellers, that such copy is a true, correct and complete copy of such resolutions and that such resolutions were duly adopted and have not been amended or rescinded, and (iii) an incumbency certificate executed on behalf of Buyer by its corporate secretaries or one of its assistant corporate secretaries certifying, in each case, the signature and office of each officer executing this Agreement or any other agreement, certificate or other instrument executed pursuant hereto; and

A0028883

MBT455A.

(d)  the Company shall have received a letter addressed to the Company from Kirkland & Ellis, based on customary reliance and subject to customary qualifications, to the effect that:

(i)  Buyer is a corporation validly existing and in good standing under the laws of the State of Delaware.

(ii)  Buyer has the corporate power to consummate the transactions on its part contemplated by this Agreement, Buyer has duly taken all requisite corporate action to authorize this Agreement; and this Agreement has been duly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer.

(e)  The Company shall have issued promissory notes to Wilfred E. Davis and Richard A. Davis in the form of Exhibit C hereto each in the principal amounts of $193,000.

(f)  Buyer shall have repaid the Company's outstanding indebtedness to the Harris Trust and Savings Bank and has obtained the release of Wilfred E. Davis' guarantees of such indebtedness.

8.3  Additional Conditions to Obligations of Buyer. The obligations of Buyer to effect the transactions contemplated hereby are also subject to the following conditions:

(a)  the representations and warranties of Sellers in this Agreement shall be true and correct as of the Closing Date as if made at and as of the Closing Date, and the Company shall in all material respects have performed each obligation and agreement and complied with each covenant to be performed and complied with by it hereunder at or prior to the Closing Date;

(b)  Sellers shall have furnished to Buyer a certificate in which Sellers shall certify that the conditions set forth in Section 8.3(a) have been fulfilled;

(c)  Buyer shall have received a letter addressed to Buyer from Hinshaw, Culbertson, Moelmann, Hoban & Fuller, based on customary reliance and subject to customary qualifications, to the effect that:

(i)  The Company is a corporation validly existing and in good standing under the laws of the State of Illinois.

(ii)  The authorized capital of the Company consists of 100,000 shares of capital stock, designated "Common Stock," having a par value of $10 per share; of which the number of shares indicated in such letter are outstanding,

-27-

A0028884

MBT455A.

all of which were duly and validly issued and are fully paid and nonassessable.

(iii) This Agreement and Exhibit E (and Exhibit F in the case of Wilfred E. Davis and Richard A. Davis and Exhibit D in the case of Wilfred E. Davis, Richard A. Davis and Dallas Crick and Exhibit G in the case of Wilfred E. Davis as trustee) have been duly executed and delivered by Sellers and constitute valid and binding obligations of Sellers enforceable in accordance with their respective terms except as enforceability may be limited by application of bankruptcy, insolvency, moratorium or similar laws affecting the rights of creditors generally or judicial limits on the right of specific performance.

(d) there shall not be threatened, instituted or pending any action or proceeding, before any court or governmental authority or agency, domestic or foreign, (i) challenging or seeking to make illegal, or to delay or otherwise directly or indirectly to restrain or prohibit, the consummation of the transactions contemplated hereby, or seeking to obtain material damages in connection with the transactions contemplated hereby, (ii) seeking to prohibit direct or indirect ownership or operation by Buyer of all or a material portion of the business or assets of the Company, or to compel Buyer or any of its subsidiaries or the Company to dispose of or to hold separately all or a material portion of the business or assets of Buyer and its subsidiaries or of the Company and the Subsidiaries, as a result of the transactions contemplated hereby, (iii) seeking to impose or confirm limitations on the ability of Buyer effectively to exercise directly or indirectly full rights of ownership of any shares of Company Common Stock, (iv) seeking to require direct or indirect divestiture by Buyer of any shares of Company Common Stock, (v) seeking or causing any material diminution in the direct or indirect benefits expected to be derived by Buyer as a result of the transactions contemplated by this Agreement, (vi) invalidating or rendering unenforceable any material provision of this Agreement (including without limitation any of the exhibits or attachments hereto) (vii) which otherwise might materially adversely affect the Company or Buyer and its subsidiaries, or (viii) otherwise relating to the transactions contemplated hereby;

(e) there shall not be any action taken, or any statute, rule, regulation, judgment, order or injunction proposed, enacted, entered, enforced, promulgated, issued or deemed applicable to the transactions contemplated hereby by any federal, state or foreign court, government or governmental authority or agency, which may, directly or indirectly, result in any of the consequences referred to in (d) above;

-28-

A0028885

MBT455A.

    (f) Buyer shall not have discovered any fact or circumstance existing as of the date of this Agreement which has not been publicly disclosed by Sellers as of the date of this Agreement regarding the business, assets, properties, condition (financial or otherwise), results of operations or prospects of the Company which is, individually or in the aggregate with other such facts and circumstances, materially adverse to the Company, or to the value of the shares of Company Common Stock;

    (g) there shall not have occurred (i) any general suspension of, or limitation on prices for, trading in securities on the New York Stock Exchange or in the over-the-counter market, (ii) a declaration of a banking moratorium or any suspension of payments in respect of banks in the United States or any limitation by United States authorities on the extension of credit by lending institutions, (iii) a commencement of war, armed hostilities or other international or national calamity directly or indirectly involving the United States, (iv) any limitation by any governmental authority on, or any other event which, in the sole judgment of Buyer, might affect the extension of credit by banks or other lending institutions in the United States, or (v) in the case of any of the foregoing existing at the date hereof, a material acceleration or worsening thereof;

    (h) Sellers and the Company shall have obtained on terms reasonably satisfactory to Buyer each consent and approval necessary in order that the transactions contemplated hereby not constitute a breach or violation of, or result in a right of termination or acceleration or any encumbrance on any of the Company's assets pursuant to the provisions of, any agreement, arrangement or understanding or any license, franchise or permit;

    (i) there shall have been no damage, destruction or loss of or to any property or properties owned or used by the Company, whether or not covered by insurance, which in the aggregate has a material adverse effect on the Company;

    (j) all of the officers and directors of the Company immediately prior to the Closing Date shall have delivered to the Company their resignations from the Company's Board of Directors effective the Closing Date;

    (k) each of Wilfred E. Davis, Richard A. Davis and Dallas Crick shall have entered into a noncompetition agreement in the form of Exhibit D attached hereto and such agreements shall be in full force and effect and shall not be amended;

    (l) each of the Sellers shall have executed a waiver and release in the form of Exhibit E attached hereto;

A0028886

MBT455A.

(m)  Wilfred E. Davis and Richard A. Davis shall have entered into a patent royalty purchase agreement in the form of Exhibit F attached hereto and such agreement shall be in full force and effect and shall not be amended;

(n)  Wilfred E. Davis, as trustee, shall have entered into a lease with the Company relating to the Company's Florida facility in the form of Exhibit G attached hereto and such lease shall be in full force and effect and shall not be amended;

(o)  each of Sellers shall have entered into this Agreement and this Agreement shall be in full force and effect with respect to each Seller and shall not be amended with respect to any Seller;

(p)  Sellers shall have delivered to Buyer the Company's stock transfer records, minute books, corporate seal and other materials related to the Company's corporate administration;

(q)  Sellers shall have delivered to Buyer copies of all necessary third party and governmental consents, approvals and filings required in order to effect the transactions contemplated by this Agreement;

(r)  the distribution of assets and assumption of liabilities contemplated by Article 1 shall have been consummated and Sellers shall have delivered to Buyer all documents and instruments in form and substance satisfactory to Buyer which in Buyer's judgment are necessary to evidence such consummation;

(s)  each of Sellers shall have discharged all of such Sellers' indebtedness to the Company (including without limitation the $102,000 indebtedness of Dallas Crick to the Company which shall be deducted from the cash purchase price to be paid to Dallas Crick hereunder) on terms reasonably satisfactory to Buyer; and

(t)  Sellers shall have delivered such other documents or instruments as Buyer reasonably requests to effect the transactions contemplated by this Agreement.

ARTICLE 9

Termination, Amendment and Waiver

9.1  Termination.  This Agreement may be terminated at any time prior to the Closing Date:

A0028887

MBT455A.

(a) by mutual consent of a duly authorized officer of Buyer and Sellers;

(b) by either Buyer or Sellers if the Closing shall not have been consummated by April 15, 1988;

*provided, however*, that no party shall have the right to terminate this Agreement unilaterally if the event giving rise to such right shall be primarily attributable to such party or to any affiliated party.

9.2 <u>Effect of Termination</u>. In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall become void and there shall be no liability or further obligation hereunder on the part of Buyer or Sellers, except as set forth in Section 7.3 and the second sentence of Section 7.7 and except for liability arising from a willful breach of this Agreement.

9.3 <u>Amendment</u>. This Agreement may not be amended except by an instrument in writing approved by the parties to this Agreement and signed on behalf of each of the parties hereto.

9.4 <u>Waiver</u>. At any time prior to the Closing Date, any party hereto may (a) extend the time for the performance of any of the obligations or other acts of any other party hereto or (b) waive compliance with any of the agreements of any other party or with any conditions to its own obligations, in each case only to the extent such obligations, agreements and conditions are intended for its benefit.

ARTICLE 10

General Provisions

10.1 <u>Public Statements</u>. Except as required by applicable law, Sellers shall not, nor shall Seller permit any officer or agent of the Company to, make any public announcement or statement or any announcements or statements to the employees, customers and suppliers of the Company with respect to the transactions contemplated hereby, this Agreement or any related transaction without the approval of Buyer, which approval will not be unreasonably withheld. Moreover, Sellers agree to consult with Buyer prior to issuing any such public announcement or statement.

10.2 <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be sufficiently given if made by hand delivery, by telex, by telecopier, or by registered

-31-

A0028888

MBT455A.

or certified mail (postage prepaid and return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by it by like notice):

if to Buyer:

c/o Douglas F. Hudson, Jr.
820 Belle Meade Drive
Miami, Florida 33138

with copies to:

Kleinwort Benson (North America) Corp.
Three First National Plaza
Chicago, Illinois 60602
Attention: David A. Gezon

Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Attention: Edward T. Swan, Esq.

and

Bell, Boyd & Lloyd
2001 Spring Road, Suite 265
Oak Brook, Illinois 60521
Attention: James F. Hendricks, Jr., Esq.

if to Sellers:

c/o Wilfred E. Davis
800 E. Northwest Highway
Palatine, Illinois

with a copy to:

Hinshaw, Culbertson, Moelmann, Hoban & Fuller
69 West Washington Street, Suite 2700
Chicago, Illinois 60602
Attention: Jerome A. Frazel, Jr., Esq.

All such notices and other communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five business days after being deposited in the mail, postage prepaid, if delivered by mail; when answered back, if telexed; and when receipt acknowledged, if telecopied.

10.3 _Interpretation_. The headings contained in this Agreement are for reference purposes only and shall not affect in

-32-

A0028889

MBT455A.

any way the meaning or interpretation of this Agreement. References to Sections and Articles refer to sections and articles of this Agreement unless otherwise stated. Words such as "herein", "hereinafter", "hereof", "hereto", "hereby" and "hereunder", and words of like import, unless the context requires otherwise, refer to this Agreement (including the exhibits and attachments hereto). As used in this Agreement, the masculine, feminine and neuter genders shall be deemed to include the others, if the context requires.

10.4 _Severability_. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants, and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated and the parties shall negotiate in good faith to modify this Agreement to preserve each party's anticipated benefits under this Agreement.

10.5 _Miscellaneous_. This Agreement (together with all other documents and instruments referred to herein); (a) constitutes the entire agreement, and supersedes all other prior agreements and undertakings, both written and oral, among the parties, with respect to the subject matter hereof; (b) is not intended to confer upon any other person any rights or remedies hereunder; (c) shall not be assigned by operation of law or otherwise, except that Buyer may assign all or any portion of its rights under this Agreement to any wholly-owned subsidiary, but no such assignment shall relieve Buyer of its obligations hereunder; and (d) shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of Illinois, without giving effect to the principles of conflict of laws thereof. This Agreement may be executed in two or more counterparts which together shall constitute a single agreement.

*   *   *   *   *

-33-

A0028890

MBT455A.

## STOCK PURCHASE AGREEMENT

*Signature Page*

IN WITNESS WHEREOF, Buyer and Sellers have caused this
Agreement to be executed on the date first written above.

NAILITE ACQUISITION CO.

By: _____

Its: _____

| SELLERS: | Shares Owned | **A**<br>Cash<br>Purchase<br>Price | **B**<br>Note<br>Purchase<br>Price |
|---|---|---|---|
| Wilfred E. Davis,<br>Trustee under Trust<br>Agreement dated<br>February 7, 1985 | 8,627.73 (72.28%) | $7,857,525 | $1,084,295 |
| Richard A. Davis | 1,356.81 (11.37%) | 1,235,687 | 170,518 |
| Dallas Crick | 450.95 (3.78%) | 410,693 | 56,673 |
| Daryl A. Boyd | 500 (4.19%) | 455,365 | 62,838 |

-34-

A0028891

MBT455A.

| | | | |
|---|---|---|---|
| Elizabeth F. Davis | 500    (4.19%) | 455,365 | 62,838 |
| Diane Joseph Feldman | 500    (4.19%) | 455,365 | 62,838 |
| | 11,935.49 | $10,870,000 | $1,500,000 |

In consideration of the direct and indirect benefits to him of the transactions contemplated by this Agreement, Wilfred E. Davis hereby enters into this Agreement in his individual capacity and assumes each of the obligations of the Sellers under this Agreement jointly and severally with each other Seller.

Wilfred E. Davis

-35-

A0028892

DISTRIBUTED ASSETS SCHEDULE TO
TO STOCK PURCHASE AGREEMENT
RE: NAILITE INTERNATIONAL, INC.
DATED AS OF APRIL 15, 1988

1)  Beneficial interest (21 1/4) of that certain Trust Agreement
dated April 27, 1973 and known as Trust Number One, covering
the property commonly known as 9595 West Grand Avenue,
Franklin Park, Illinois.

2)  Interest (30%) in the Valley Industrial Park Partnership.

3)  Interest (33 1/3%) in Camfield Fiberglass Plastics, a
partnership.

4)  Interest (60%) in Forest City Joint Venture.

5)  Interest (32.81%) in Sterling National Property, a joint
venture.

6)  Interest (33 1/3%) in the Armforge Venture, a joint venture.

7)  Interest (50%) in the Whitehead and Kales Venture, a joint
venture.

8)  Interest (30%) in the Erie Joint Venture.

9)  Interest (33 1/3%) in the Zimmer Manufacturing Venture, a
joint venture.

10) Interest (29 1/3%) in SDK Properties, a joint venture.

11) Interest (33 1/3%) in the RCA/DDI Joint Venture

12) Interest (10%) in the Cleveland Hubbard Property, a joint
venture.

13) Interest (60%) in the CWC Joint Venture.

14) All office furniture, fixtures (trade and otherwise),
equipment, supplies and personal property of every kind and
nature located in the Nailite office at 800 East
Northwest Highway, Palatine, Illinois 60067.

15) 1986 Cadillac Coup de Ville, Serial Number 1 G 6 CD 6986 G
4315369.

16) 1986 Cadillac Coup de Ville, Serial Number 1 G 6 CD 476 G
4329027.

A0028893

17) 1986 Cadillac Coup de Ville, Serial Number 1 G 6 CD 476 G 4352168.

18) 1986 Cadillac Sedan de Ville, Serial Number 1 G 6 CD 518 X 43081.

19) All other assets of every kind and nature owned by Nailite International, Inc. in Illinois.

20) Continental Assurance Life Insurance Policy #1138125 on the life of Wilfrid E. Davis in the amount of $5,000.00.

21) $1,070,591.20 in Harris Trust & Savings Bank (Chicago) Account No. 2380632.

A0028894

DISCLOSURE SCHEDULE

To Stock Purchase Agreement
Re Nailite International, Inc.
Dated as of April 15, 1988

CAPITALIZATION

None.

SUBSIDIARIES

All of those Joint Ventures and Partnership Interests listed
in Distributed Asset Schedule.

DEVELOPMENTS

5.8(c)     Loans from Harris Trust & Savings Bank in the
           amount of $950,000.00.

5.8(e)     Security given for Harris Bank loans described in
           5.8(c) above.

5.8(k)     Bonus Agreements with Dallas Crick, Barrington
           Bell and Robert Stokes in connection with this
           transaction providing for payments of $200,000,
           $50,000 and $100,000, respectively, which
           agreements will be paid in full from the
           Distributed Assets.

5.8(l)     None other than pursuant to the Agreement
           described in 5.13(a)(x).

LEASES

5.9(a)     IBM Credit Corp. Term Lease Master Agreement dated
           11/12/87 leasing various computer equipment.

           Various automobile leases described in Exhibit A
           attached.

5.9(b)     Lease between Kladovo Investments N.U. and
           Nailite, Inc. dated April 7, 1980 covering
           premises at 1251 N.W. 165th St., Miami, Florida,
           33319-5871, as amended September 7, 1987, which
           lease shall be terminated as of the Closing Date.

A0028895

DISCLOSURE SCHEDULE

To Stock Purchase Agreement
Re Nailite International, Inc.
Dated as of April 15, 1988

---

CAPITALIZATION

None.

SUBSIDIARIES

All of those Joint Ventures and Partnership Interests listed
in Distributed Asset Schedule.

DEVELOPMENTS

5.8(c)    Loans from Harris Trust & Savings Bank in the
amount of $950,000.00.

5.8(e)    Security given for Harris Bank loans described in
5.8(c) above.

5.8(k)    Bonus Agreements with Dallas Crick, Barrington
Bell and Robert Stokes in connection with this
transaction providing for payments of $200,000,
$50,000 and $100,000, respectively, which
agreements will be paid in full from the
Distributed Assets.

5.8(l)    None other than pursuant to the Agreement
described in 5.13(a)(x).

LEASES

5.9(a)    IBM Credit Corp. Term Lease Master Agreement dated
11/12/87 leasing various computer equipment.

Various automobile leases described in Exhibit A
attached.

5.9(b)    Lease between Kladovo Investments N.U. and
Nailite, Inc. dated April 7, 1980 covering
premises at 1251 N.W. 165th St., Miami, Florida,
33319-5871, as amended September 7, 1987, which
lease shall be terminated as of the Closing Date.

A0028895

## ASSUMPTION OF LIABILITIES

For valuable consideration, and in connection with the Stock Purchase Agreement dated as of April 15, 1988 (the "Acquisition Agreement") by and among Wilfred E. Davis, as Trustee under the Trust Agreement dated February 7, 1985, Richard A. Davis, Dallas Crick, Daryl A. Boyd, Elizabeth F. Davis and Diane Joseph Feldman (collectively the "Sellers") and Nailite Acquisition Co., a Delaware corporation ("Buyer"), the Sellers and Wilfred E. Davis, in his individual capacity, hereby assume and agree to pay, perform and discharge any and all obligations and liabilities of Nailite International, Inc., an Illinois corporation (the "Company"), (whether known or unknown, accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when asserted) arising out of transactions entered into prior to the Closing Date (as defined in the Acquisition Agreement), or any action or inaction, or any state of facts existing at or prior to the Closing Date, including taxes with respect to or based upon transactions or events occurring prior to the Closing Date, except for (a) liabilities reflected in the December 31, 1987 balance sheet of the Company's Nailite International Division (the "Florida Division"), a copy of which has been delivered to Buyer prior to the date of this Assumption; (b) obligations under contracts or commitments described in the Disclosure Schedule (as defined in the Acquisition Agreement) under the caption "Contracts" or "Leases" (but not liabilities for breaches thereof) or under contracts and commitments entered into in the ordinary course of business which are not required to be disclosed thereunder (but not liabilities for breaches thereof), (c) liabilities which have arisen after the date of the balance sheet referred to in (a) above in the ordinary course of business of the Florida Division (none of which is a liability for breach of contract, breach of warranty, tort, infringement, claim or lawsuit), and (d) liabilities otherwise expressly disclosed in the Acquisition Agreement or in the Disclosure Schedule and not to be assumed by Sellers.

IN WITNESS WHEREOF, this Assumption of Liabilities is executed as of April 15, 1988.

_Wilfred E. Davis Trustee_
Wilfred E. Davis, as Trustee
under the Trust Agreement
dated February 7, 1985

_Daryl A. Boyd_
Daryl A. Boyd

_Wilfred E. Davis_
Wilfred E. Davis

_Elizabeth F. Davis_
Elizabeth F. Davis

_Richard A. Davis_
Richard A. Davis

_Diane Joseph Feldman_
Diane Joseph Feldman

_Dallas Crick_
Dallas Crick

A0029764

EXHIBIT C